UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

# ORIGINAL

- - - - - - - - - x
PETER ANDERSON, et al,
          Plaintiffs,    |   Civil Action No.
                           3:03CV116(MRK)

          vs.         |

GORDON R. ENGLAND, SECRETARY |
OF THE NAVY,               November 5, 2003
          Defendant.   |
- - - - - - - - - x

## DEPOSITION OF PETER ANDERSON

Taken before Deborah Stedman, LSR #261, a
Court Reporter and Notary Public, within
and for the State of Connecticut,
pursuant to Notice and the Federal Rules
of Civil Procedure, at the Naval Submarine
Base New London, Groton, Connecticut, on
November 5, 2003, commencing at 10:45 a.m.

United States District Court
District of Connecticut NEW HAVEN
FILED AT

7/30 2004

Kevin F. Rowe, Clerk

By
Deputy Clerk

FALZARANO COURT REPORTERS
117 N. Saddle Ridge
West Simsbury, CT  06092
860.651.0258

EXHIBIT A-1

1  head but rather give a verbal answer to the questions I
2  ask, correct?
3      A    Correct.
4      Q    And please wait until I am done, as you are
5  now, before you answer the questions that I ask.  Okay?
6      A    Yes.
7      Q    Very well then.  When did you begin your
8  service aboard the New London sub base?
9      A    Approximately the end of 1979; it was around
10  October, November approximate.
11      Q    What was the position that you came in?
12      A    GSO-83/4, a police officer.
13      Q    Did you work at the sub base for an unbroken
14  period of time until your retirement?  Did you have any
15  jobs in between 1979 when you first came to the sub
16  base and your retirement?
17      A    I left the department, yes.
18      Q    When did you first leave the department?
19      A    I left the department in '86.
20      Q    For how long a period of time?
21      A    Approximately six months.
22      Q    So you returned again in 1986 later that same
23  year?
24      A    Approximately six months later; whether it
25  was '86, '87, I am not sure.

1      A    I was a GSO-83/11, police supervisor,
2  training division.
3      Q    What rank was part of your position?
4      A    Captain.
5      Q    When did you first meet Pamela Coleman?
6      A    I believe it was the early '80s.
7      Q    Where did you meet Lieutenant Coleman?
8      A    She got hired as a guard.
9      Q    Now during the fall of 2001 when you were a
10  captain, what was her position on the force?
11      A    She was a lieutenant, police lieutenant.
12      Q    Can you explain to me in terms of seniority
13  how those positions relate to each other, your being a
14  captain and her being a lieutenant?
15      A    I got more money.
16      Q    How about in terms of seniority, in terms of
17  grade, which position had a greater position of
18  seniority?
19      A    By grade, it was mine.
20      Q    By grade within the police force, are there
21  responsibilities greater given to a captain than a
22  lieutenant?
23      A    They are supposed to be.
24      Q    What are the differences in responsibilities
25  between a captain and a lieutenant?

1      Q    Did you have any other breaks in your
2  employment aboard the base?
3      A    No.
4      Q    When did you actually retire from federal
5  service?
6      A    On 9/21/2002.
7      Q    Your retirement was under a voluntary
8  separation incentive program?
9      A    It's listed as that, yes.
10      Q    It was, okay.  In other words, it was your
11  choice to retire at that time, you were not forced from
12  the force for any reason?
13      A    Yes and no.
14      Q    Okay, please explain that to me.
15      A    Well, I wouldn't have left as early as I did.
16  I had like nine years to go for my full pension plus I
17  still had upward mobility and so I would have stayed in
18  if this incident had been resolved.
19      Q    By this incident you are referring to the
20  bases of the claim that you've filed in federal
21  district court?
22      A    It's about the Lieutenant Coleman issue, how
23  no one ever addressed it.
24      Q    What was your position at the security
25  department during the fall of 2001?

1      A    Well, lieutenant in our department just runs
2  a shift.  I was overall responsible for the planning,
3  organizing, directing, controlling of all the training
4  issues and special events sometimes, stuff like that.
5      Q    So as a captain within the police department
6  in the fall of 2001, you were senior to Lieutenant
7  Coleman?
8      A    In rank alone.
9      Q    What else was there?
10      A    She had, in the department -- it's hard to
11  explain.  In the department she had one faction of the
12  house and I had one, the other faction of the house.
13      Q    Now, the faction of the house that you were
14  responsible for included the people that she was
15  responsible for supervising, correct?
16      A    No, I was responsible.  See, that's why I
17  don't understand, you know.  I can explain it, I will
18  go into it.  I was a police supervisor but yet I didn't
19  have -- all my responsibilities after an incident got
20  eroded away, so I was just a token figurehead.  Every
21  few months I had a new person in the office with me, I
22  never had any like permanent staff.  I'd have a chief
23  in and they'd move him over here; then I'd get a couple
24  people messed up on the road and they send them in,
25  help me.  My job was to make sure everybody went to

```
 1    school, got the training they were supposed to do,
 2    schedule it, interact with outside agencies.  Like when
 3    911 went down, I had to acquire weapons and equipment
 4    for the base and so my job was like always changing.
 5    But in a normal police department a captain would be,
 6    you know, running the whole show; I had no say, you
 7    know, so -- if that's what you are trying to get at.  I
 8    mean, in other words, I couldn't tell her, you know,
 9    Your police car is parked on a yellow curb, move it.
10        Q    In terms of the civilian work force in the
11    security department, who was the senior civilian
12    employee in the security department in the fall of
13    2001?
14        A    That would be myself.
15        Q    And so there was only one captain?
16        A    Correct.
17        Q    And that was you?
18        A    I was the highest police officer, yes.
19        Q    In terms of the next lower graded position,
20    would that have been a lieutenant?
21        A    Correct.
22        Q    How many lieutenants were there on the work
23    force in the fall of 2001?
24        A    There was three.
25        Q    Those would have been lieutenants Cothran,
```

```
 1    Coleman and who was the third?
 2        A    Lieutenant Stevens.
 3        Q    Lieutenant Stevens.  And those three
 4    lieutenants were each platoon sergeants in charge, each
 5    of them, responsible for one shift of the watch?
 6        A    No, they were -- they were police
 7    lieutenants; they had a sergeant, they had a corporal
 8    and they had all the people underneath them, anywhere
 9    from 20 to 30 people working for them.
10        Q    And each of those lieutenants was responsible
11    for one shift of the watch?
12        A    Correct.
13        Q    Now, what hours were you working in the fall
14    of 2001?
15        A    I was on a flex schedule, I forget the exact
16    term.  Basically I worked -- I usually worked anywhere
17    from like 7:00 -- 7:00 to 3:30 but my schedule allowed
18    me to, to save money on overtime and all that because I
19    had to go do gun shoots, other training and go
20    different places; so I had flex time, so I could come
21    in for four hours, you know, work, then go home, then
22    come back in and do four hours.  So whatever that flex
23    schedule was.
24        Q    Prior to the fall of 2001 had you filed any
25    administrative complaints, EEO complaints?
```

```
 1        A    Yes.
 2        Q    When was the first EEO complaint that you
 3    filed?
 4        A    I believe the first one was when -- was for
 5    my job when there was a RIF in 1994 and, through
 6    attrition, the people that, they were only supposed to
 7    affect -- the RIF was only supposed to affect the
 8    police officer on the road; and then, when the
 9    commander came in and the other people weren't playing
10    ball, he changed and he included them.  So what that
11    did is that wiped out the entire supervisory structure
12    and I was put into the position of deputy chief of
13    police, and then it, throughout the four years or so,
14    it changed to the various titles, deputy chief of
15    police, deputy public safety officer, the title changed
16    lots of times because the Navy went from being paranoid
17    about the word Police to Security, they went because
18    they had done that massive RIF and they changed
19    everything and then it went back.
20        Q    What was the basis of the EEO complaint that
21    you filed in 1994?
22        A    I held a position of the deputy director of
23    public safety for four years.  I was like the number
24    two person in charge.  I did all the planning,
25    organize, directing and controlling, hiring, firing and
```

```
 1    stuff like that.  And then we got a guy named
 2    Mr. Alexander that came in, a civilian department head
 3    that was supposed to help the base, he worked for the
 4    CO's office; and she kept going over there and saying
 5    Anderson's doing this job, he's not supposed to, he's
 6    only a police lieutenant, and he'd call me up, and he
 7    said not to me but I would talk to my -- Mr. Sheridan
 8    or whoever, Commander Stafford, and say Anderson's
 9    phone says deputy director of public safety, he's only
10    the police lieutenant, da, da, da, da, he needs to stop
11    that.
12             So what that did is that put it to a head for
13    them to put out an announcement for the job, you know,
14    the position that I was holding.  So I wrote up two
15    position descriptions, one for the training officer, a
16    GS-11, and one for the police, chief of police, public
17    safety officer, and that was a -12, and they kept
18    holding off on the police job.  Then they finally
19    changed the chief of police job to a security 080,
20    manager instead of an 083 police series, and I put in
21    for that job and they hired Mr. Sheridan.
22        Q    So was the basis of your EEO complaint a non
23    selection complaint?
24        A    It was a non selection and how she had
25    interfered in, you know, to bring upon this problem.
```

1  support to get these things done, to get people to
2  training that they weren't going to, that I just -- if
3  it wasn't a personal one-on-one attack with me, I just
4  let it roll off my back or I would tell my boss.
5      Q    Now please forget for a moment, I am not
6  asking you about what other people told you she said.
7  In the year before the firing range incident, in the
8  fall of 2001, did Lieutenant Coleman talk to you during
9  that last year at all in a manner that invited you to
10  have sexual relations with her?
11     A    No.
12     Q    During that year did she talk to you at all
13  about her own sexual activity and behavior that you
14  found lewd and offensive?
15     A    In groups there, yes.
16     Q    You were present and heard her speak this
17  way?
18     A    Yes.
19     Q    What action did you take to let her know that
20  you found her words to be lewd and offensive?
21     A    I left.  If you mean put her on notice, she's
22  been on notice I don't know how many times by me.
23     Q    As a captain listening to a junior
24  Lieutenant, what disciplinary action, if any, did you
25  take?

1      A    None.
2      Q    What administrative action did you take to
3  ensure that her record reflected this unprofessional
4  behavior?
5      A    I told my supervisors and they said don't
6  worry about it.
7      Q    Who did you tell?
8      A    Everybody that was in my chain of command:
9  Chief Haas, Senior Chief Ricard, Master Chief Powden,
10  Commander Wroolie, Commander Stafford, Lieutenant
11  Gardner, Chief Grisby.  Everybody that was there, they
12  were all told.
13     Q    Do you have any letters or e-mails notifying
14  them about this behavior?
15     A    Yes.
16     Q    Now in the complaint that you filed after the
17  firing range incident there is no description about the
18  alleged harassment being based on your age, but the
19  lawsuit that we have before us indicates discrimination
20  based on age.  Can you tell me why you did not raise
21  age discrimination in your administrative complaint?
22     A    No.
23     Q    Why do you have an age component present in
24  this lawsuit?
25     A    Because, because of my age.

1      Q    What acts or words did Lieutenant Coleman use
2  about you that were based upon your age?
3      A    That I was a young fuck.  I guess she's
4  older, I don't know how many -- ten years, I don't
5  know; and, Young people, you know, they just, they are
6  not worth a shit.
7      Q    Now, did you notify the Equal Employment
8  Opportunity Commission about your intent to file an age
9  discrimination claim before you filed this lawsuit?
10     A    It was on the form, yes, I put race and age.
11     Q    Now, what form are you talking about?
12     A    My initial interview where Ernie or the other
13  lady was writing it down, I believe I have copies of
14  it.  I have like 28 pounds of paper.
15     Q    There is no mention of age in that informal
16  complaint, correct, or the formal complaint; is that
17  correct?
18     A    I haven't seen it.
19     Q    Would it surprise you to learn that you did
20  not include age as a basis of your administrative
21  complaint?
22     A    That's what you are telling me?
23     Q    Yes.
24     A    I saw it on a paper and I have to pull it
25  out.  I believe that it is there.

1      Q    Okay.  I am showing you from the record of,
2  the Record of Investigation from your administrative
3  complaint, pages 17 and 18, an intake form signed by
4  Ernest Signorino, now is that the gentleman you saw
5  when you made contact with the local EEO office?
6      A    I've dealt with that and then the other lady.
7  I dealt with two people and then I've also talked to
8  Peggy Samms too.
9      Q    Mr. Signorino's document is dated November
10  7th of 2001.  Would that have been the time that you
11  made contact with the -- your complaint regarding the
12  firing range incident and Lieutenant Coleman?
13     A    I'd have to look at it.
14     Q    Please take a moment.
15     A    Yeah, I don't see it on this paper.
16     Q    Let me show you page 2 and 3 of that same
17  report of investigation.  Is that your signature at the
18  bottom of page 2 --
19     A    Correct.
20     Q    -- dated January 31st, 2002?
21     A    Uh-huh.
22     Q    And in the block indicating, Check below why
23  you believe you were discriminated against, what areas
24  did you check in terms of the basis of discrimination?
25     A    According to this paper here it says sex,

1   physical handicap and reprisal.
2       Q    So age is not checked on that block, correct?
3       A    On that page, correct.
4       Q    On page 38 of that report of investigation is
5   a copy of the acknowledgment of agency of the issues
6   that you presented, correct?
7           Does that letter look familiar?
8       A    I have to say yes.
9       Q    That letter in paragraph 2(b) noting the
10  issues that you've set forth indicates discrimination
11  based on sex, correct?
12      A    Correct.
13      Q    So are you aware of any evidence indicating
14  that you raised age discrimination on this complaint?
15      A    On that one, no.
16      Q    Are you aware whether or did you file any
17  subsequent notification with the Equal Employment
18  Opportunity Commission indicating an intent to file an
19  age discrimination claim prior to filing the age
20  discrimination claim in this complaint?
21      A    Well, like I explained earlier, I believe I
22  have a piece of paper that says it's on there. Your
23  paperwork doesn't say that. I went to the office for
24  informal, formal, end to close, this and that, I talked
25  to them I don't know how many times and I believe that

1   I have a piece of paper that says age. I don't know
2   what that -- but I do.
3       Q    Did you file anything with the EEOC after May
4   of 2002 and before you filed this lawsuit in January of
5   2003 indicating your intent to file an age
6   discrimination complaint?
7       A    No.
8       Q    Did Lieutenant Coleman ever exercise
9   supervisory control over you?
10      A    No.
11      Q    Did you ever exercise supervisory control
12  over her?
13      A    Yes.
14      Q    When was that?
15      A    Like I explained earlier, in the early '80s
16  and then up until 1994.
17      Q    Now by virtue of your being a captain in the
18  fall of 2001 and her being a lieutenant, you did have a
19  period -- I am sorry, a position of authority in the
20  police department that was greater than hers, correct?
21      A    No.
22      Q    As a captain you were not in a position of
23  greater authority than a lieutenant?
24      A    No, no.
25      Q    What percent of the days of your time did you

1   actually work from 7:30 or 7:00 a.m. until about 3:00
2   or 3:30?
3       A    The majority.
4       Q    I mean four out of every five?
5       A    I'd be guessing.
6       Q    What shift did Lieutenant Coleman work during
7   the fall of 2001?
8       A    You'd have to -- I don't know. She, she, she
9   moved several times and I don't know what the dates
10  are. She bumps Lieutenant Cochran. She did this, she
11  did that; I don't have any idea. They put her in CID
12  detail for I don't know how long. She was on days. I
13  don't know where she was at, I didn't keep track.
14      Q    Can you describe the kind of interaction that
15  you had with the platoon commanders on a daily basis?
16      A    Excellent.
17      Q    I am sorry, the kind of interaction. Not
18  your relationship but the kind of interaction.
19          How much did you see them each day?
20      A    Most of my interaction was with e-mail. I
21  did bump into them, you know, when I had to go talk to
22  them about getting stuff signed, you know, daily force,
23  training events and stuff like that but most of my
24  contact was through, you know, e-mail.
25      Q    There are three shifts, correct?

1       A    Uh-huh.
2       Q    And the first shift, the day shift came on at
3   what time?
4       A    6:30, around there.
5       Q    And got off at about what time?
6       A    By 4:00.
7       Q    So the day shift platoon commander had hours
8   that were substantially the same as yours, correct?
9       A    Correct.
10      Q    How much time during the course of a normal
11  day would you spend with the day shift commander?
12      A    Under an hour.
13      Q    That would be seeing then on a few different
14  occasions?
15      A    Correct.
16      Q    Your office was on what floor of the security
17  department building?
18      A    It was on all the floors.
19      Q    You had offices on all the floors?
20      A    The last part of my tenure, I got moved every
21  other week, it seemed like.
22      Q    I am sorry, in the fall of 2001 and
23  throughout -- let's say 2001, 2002. On what floor was
24  your primary office located?
25      A    I am not sure. I got moved around so much I

42

had like four or five offices.  I got moved around.  It
was a joke, I mean they didn't know where I was going
to be at.

Q     What floor were the platoon commander
officers on?

A     First.

Q     How often was your office on the first floor?

A     The last -- I am just guessing here now, I
think the last maybe six months was on the bottom floor
in one spot and then I was across the hall in another
office before that and then I had another office that
was next to the platoon things and then I had two
offices upstairs, you know, that got kicked -- I got
moved around a lot.  Three offices upstairs.

Q     For the majority of 2001 then were your
offices on the second floor of the building?

A     Majority of the time, no.  I already did --
if I did six months in just one spot and then I had
another office across the hall, it wouldn't equate to
that.

Q     I thought that you retired in the fall of
2002, correct?

A     Right.

Q     And the last six months.  So that would have
been still within 2002 and I am asking you, within

Falzarano Court Reporters

---

43

2001, was the majority of your office time located on
the second floor?

A     I am not trying to skirt the issue.

Q     You were just not sure?

A     I am trying not to be pinned down because I
had an office in the training room which is downstairs
and I had an office right next door to the training
office that I maintained too, so I was downstairs a
lot; so I don't know whether it was three-quarters of
the day, a tenth of the day, I mean. . .

Q     Let me get back to the shift commanders.  I
believe you've already indicated that, in terms of the
day-shift commander, you'd see that person for less
than an hour a day?

A     Correct.

Q     With regard to the second shift, that shift
worked from roughly 3:00, 3:30 in the afternoon until
11:00, 11:30 at night; is that correct?

A     Around those hours, yes.

Q     How much interaction, personal interaction
did you have with that shift commander on a daily
basis?

A     About half the time that I would spend with
the day-shift person.

Q     So a half hour or less?

Falzarano Court Reporters

---

44

A     Right.

Q     Now the third shift went from about eleven
o'clock at night, 11:30 until about 6:30 in the
morning, correct?

A     No, they wouldn't leave until 7:00, 7:20.

Q     And how much interaction would you have with
the third-shift commander?

A     About the same as, as the second shift, half
an hour, somewhere around there.

Q     I believe you've already indicated that for
the majority of the time you'd have as little contact
as possible with Lieutenant Coleman when she was a
shift supervisor; is that correct?

A     Correct.

Q     How much daily contact did you have with
Lieutenant Coleman during the 2001/2002 time frame?

A     I already explained that, like a half hour.

Q     We didn't do it by name.  I am not trying to
confuse you.

A     No, no.

Q     These folks worked on different shifts,
correct?

A     Correct.

Q     And so I just -- I understand typically,
regardless of name, that you had about an hour a day

Falzarano Court Reporters

---

45

contact with the first shift and a half hour a day with
the second and the third-shift supervisors, correct?

A     Correct.

Q     And so that held true for Lieutenant Coleman
the same as it did for Lieutenant Cochran or Lieutenant
Stevens, correct?

A     Yes and no.  Except for when she was in the
CID for that stint; six months, a year, I don't know
what it was.

Q     When she was in CID how much daily contact
did you have with her?

A     A lot.  She was running around all the time,
always coming upstairs and yelling at somebody or in
the hallways because I had to go around to the various
offices.

Q     But how much contact did she have with you
where your jobs caused you to interact?

A     Just on training issues, I don't know, I
couldn't put an exact time frame.  Sometimes it was a
lot, sometimes it wasn't much.

Q     Would days go by where you had no
professional contact or personal contact with her?

A     Correct.

Q     What percent of the work force at the time
you retired -- let's take a snapshot at that time; what

Falzarano Court Reporters

```
 1   percent of the work force would you say was male?
 2       A    Predominantly.
 3       Q    But what percentage?
 4       A    80 percent.
 5       Q    What percent of the security department work
 6   force would you say was military at that time?
 7       A    The majority of it.
 8       Q    Again can you put a number on it?
 9       A    Say 75 percent.
10       Q    What percent of the work force would you say
11   was older than 40 at that time?
12       A    These are all guesses.  I'd say older than
13   40, probably like 20 or 30 percent.
14       Q    I believe you alluded to it earlier but is it
15   your understanding that Lieutenant Coleman is older
16   than you are?
17       A    Yes.
18       Q    How much a part of the work environment was
19   cursing?
20       A    In what time, what years?
21       Q    How prevalent was it, 2001 until your
22   retirement in 2002?
23       A    Very prevalent.
24       Q    And did you curse in the workplace?
25       A    I try not to do it in the public.  I can't
```

```
 1   say I didn't swear in my office.
 2       Q    When you say in public, what do you mean?
 3       A    When there is people around that, that are
 4   not, you know, that are subordinates and stuff.
 5       Q    But you acknowledge that, in fact, you did
 6   curse in the workplace?
 7       A    Not at people; but, Oh, shit, or something
 8   like that, but not at people.
 9       Q    And what difference does it make in your mind
10   whether the curse is directed at someone or just used?
11       A    Well, when you say, Listen, motherfucker,
12   like that and you are pointing to somebody and you are
13   spitting at them, I am going to fucking get you, and
14   that stuff, that's different than saying, Oh, shit, I
15   got to go, we forgot to open gate three, or, they
16   didn't inspect this, you know, Damn, they didn't do
17   this.  That's different than aggressive, you know,
18   Motherfucker, da, da, da, you know, shit like that.
19   Stuff like that.
20            See, now I am starting to curse.  Sorry.
21       Q    Did you ever curse at people during that time
22   frame?
23       A    I can't say I didn't but I set myself high
24   standards.  To a subordinate, no.
25       Q    Did you ever discipline subordinates for
```

```
 1   cursing in the workplace?
 2       A    I put out a policy about it.
 3       Q    What was your policy?
 4       A    It's a memo when I was in charge about how it
 5   would cease and desist with Commander Wroolie and we
 6   had a real quiet four years.
 7       Q    But during the 2001, 2002 time frame which is
 8   when you've told me that cursing was still prevalent,
 9   did you discipline any persons for cursing in the
10   workplace?
11       A    No, I told you I didn't have any authority.
12   I was just a captain by token, I had no power or
13   control over anybody other than to say -- than to ask
14   them if they would show up at prescribed time; and if
15   they wanted to, they would.  Can I say something else?
16            MR. De NIGRIS:  No, I don't want you
17       to say anything.
18            THE WITNESS:  All right.
19   BY MR. VERDUCCI:
20       Q    Now, weren't you told by supervisors within
21   the security department on a number of occasions that
22   they had taken disciplinary action or had taken action
23   in response to your complaints about Lieutenant
24   Coleman?
25       A    Yes.
```

```
 1       Q    Do you know whether Lieutenant Coleman had,
 2   in fact, issued or filed complaints against you as
 3   well?
 4       A    Yes.
 5       Q    Did your supervisors ever pull you aside and
 6   discuss her complaints against you?
 7       A    Yes.
 8       Q    Were you ever subject to disciplinary action
 9   as a result of the complaints that she filed?
10       A    No.
11       Q    What actions were taken?
12       A    Against who?
13       Q    Against you.
14       A    None.  I have a clean record.  I have never
15   been written up.
16       Q    Describe the nature of the conversations that
17   your supervisors had with you regarding the complaints
18   that Lieutenant Coleman filed.
19       A    Well, you know, I can't do nothing, you know,
20   my hands are tied; you know, you got to live with it;
21   take one for the team; just do it; you know, just let
22   it roll off your back; you know, we don't, we don't
23   fuckin' let her get to us; we don't know why you are
24   getting so upset, it's nothing; she just accused you of
25   doing this, stuff like that.
```

1    Q   How do you feel -- well, is it fair to say
2 that the relationship that you and Lieutenant Coleman
3 have or had, rather, at work professionally was one of
4 hate?
5    A   Not myself, no.
6    Q   You didn't hate her?
7    A   No, I got in trouble.  I promoted her when I
8 was in charge.
9    Q   Did you speak ill about her towards other
10 people in the workplace?
11    A   As to what?
12    Q   Did you say bad things about her to other
13 people who worked in the security department?
14          MR. De NIGRIS:  I am just going to
15      object to the form of the question.  I don't
16      know what you mean by bad things but. . .
17    Q   Did you, you know, call her a bitch and
18 other, you know, names like that and talk about her in
19 that sort of manner to other people who worked in the
20 security department while you were working as a captain
21 there?
22    A   Might have.  Nothing sticks out.
23
24         (Recess:  11:19 to 11:23 a.m.)
25

1      compound; not sure whether he answered yes,
2      he initiated the complaint or he knows who
3      did.
4    Q   Did you initiate a hot line complaint?
5    A   Yes, I told them I did.
6    Q   Do you know what the outcome of that hot line
7 complaint to the IG's office was?
8    A   Yes.
9    Q   What was that?
10    A   There is a report that I gave you.
11    Q   Tell me for the record purposes what was the
12 outcome of that complaint.
13    A   Everything that I've stated was substantiated
14 where I was, where she made false accusations against
15 me or her conduct, her, how nothing's been taken, no
16 action has been taken against her for her inappropriate
17 conduct, stuff like that.
18    Q   Now, we had a lot of questions, we had a lot
19 of questions from or several questions that I can
20 remember from Mr. Verducci about your rank as a captain
21 versus her rank as a lieutenant and I don't think it's
22 clear for record.  Try and clear up for me what did you
23 actually mean or what did you mean when you indicated
24 that you -- I believe your testimony was that you
25 really didn't have any authority; what did you mean by

1         MR. VERDUCCI:  No further questions.
2      Mr. Anderson, I want to thank you and let you
3      know that we are going to stop now and
4      reserve the right to continue at a later
5      point in time, if necessary, your deposition.
6         MR. De NIGRIS:  Okay.  Just for
7      purposes of the record here, are you talking
8      about today or are we talking about at a
9      future date?
10         MR. VERDUCCI:  At a future date.
11         MR. De NIGRIS:  I just have a couple
12      of questions that I'd like to ask
13      Mr. Anderson if I could.
14
15            CROSS-EXAMINATION
16
17 BY MR. De NIGRIS:
18    Q   Peter, can you tell me, please, did you or do
19 you know of anybody that initiated an Inspector General
20 hot line report, hot line complaint to the agency about
21 Lieutenant Coleman's conduct?
22    A   Yes.
23    Q   Do you remember when that was?
24         MR. VERDUCCI:  I am sorry, I am going
25      to object to the first question as to

1 that?
2    A   I was --
3    Q   And if I've characterized your testimony
4 wrong, tell me, but that's what I understood your
5 testimony to be.
6    A   No, it's true I was just a token captain in
7 rank only, I had no authority over anybody.  I had to
8 go to my supervisors and make complaints that the
9 people weren't showing up; complaints that when people
10 did something I had no administrative action over
11 anyone.
12    Q   As it applied to Lieutenant Coleman's
13 conduct, how would that have played out or how did it
14 play out?
15    A   For each occurrence where she bothered me or
16 made a false accusation against me, I told my
17 supervisor, that's all I could do.
18    Q   What was your supervisor's response?
19    A   They varied but basically there was nothing
20 ever done.
21         MR. De NIGRIS:  I don't have any
22      further questions at this time.
23         MR. VERDUCCI:  I do, just a couple in
24      light of that.
25

REDIRECT EXAMINATION

BY MR. VERDUCCI:

Q    As a captain in the security department, did you have an obligation to ensure that policies and the procedures and regulations that govern the department were carried out?

A    No, I was told to stay out of it.

Q    You had no responsibility to ensure that any security department policies and regulations were carried out?

A    No, I -- when I saw violations, I reported it.  That was the extent.

MR. VERDUCCI:  Thank you.  Thank you.

MR. De NIGRIS:  Okay, thank you.

(Deposition adjourned:  11:30 a.m.)

STATE OF CONNECTICUT

I, DEBORAH A. STEDMAN, a Notary Public, duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Agreement there came before me on the 5th day of November, 2003, the following named person, to wit: Peter Anderson, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this 20th day of November, 2003.

*Deborah A. Stedman*
Deborah A. Stedman
LSR #261
Notary Public

My Commission Expires:  September 30, 2007.

Falzarano Court Reporters

Falzarano Court Reporters

56

I N D E X

WITNESS                                          PAGE

Peter Anderson

Direct Examination by Mr. Verducci          4
Cross-Examination by Mr. De Nigris          51
Redirect Examination by Mr. Verducci        54

Falzarano Court Reporters

# ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


```
- - - - - - - - - - x
PETER ANDERSON, et al,
              Plaintiffs,      |    Civil Action No.
                                    3:03CV116(MRK)
         vs.                   |

GORDON R. ENGLAND, SECRETARY   |
OF THE NAVY,                        May 4, 2004
         Defendant.            |
- - - - - - - - - - x
```


### DEPOSITION OF PETER ANDERSON
Volume 2


Taken before Deborah Stedman, LSR #261, a
Court Reporter and Notary Public, within
and for the State of Connecticut,
pursuant to Notice and the Federal Rules
of Civil Procedure, at the Naval Submarine
Base, Groton, Connecticut, on May 4, 2004,
commencing at 9:40 a.m.


FALZARANO COURT REPORTERS
117 N. Saddle Ridge
West Simsbury, CT  06092
860.651.0258


EXHIBIT A-2

1  APPEARANCES:

2       For the Plaintiffs:

3            LAW OFFICES OF STEPHEN G. DE NIGRIS
             2100 M Street N.W., Suite 170
4            Washington, D.C.  20037-1233
             800.791.9908  (Phone)
5            888.791.4441  (Fax)
                 By:  STEPHEN G. DE NIGRIS, ESQ.
6

7       For the Defendant:

8            UNITED STATES ATTORNEY'S OFFICE
             450 Main Street
9            Hartford, CT  06103
             860.947.1101
10               By:  LISA E. PERKINS, ESQ.
                      Assistant United States Attorney
11
                 -and-
12
             OFFICE OF CIVILIAN HUMAN RESOURCES
13           221 Somers Court, N.W., Suite 40103
             Washington, D.C.  20393-5441
14           202.764.0694
                 By:  ANTHONY J. VERDUCCI, ESQ.
15

16      Also Present:

17           R. DAVID GALE, JR.
             Counsel to the Commander
18           Commander Navy Region Northeast
             Naval Submarine Base New London
19           Groton, CT  06349-5101

20

21

22

23

24

25

Falzarano Court Reporters

4

---

1                    S T I P U L A T I O N S

2

3            It is stipulated by counsel for the

4  parties that all objections are reserved until the time

5  of trial except those objections as are directed to the

6  form of the question.

7            It is further stipulated and agreed between

8  counsel for the parties that the proof of the authority

9  of the Notary Public before whom this deposition is

10  taken is waived.

11           It is further stipulated that any

12  defects in the Notice are waived.

13           It is further stipulated that the

14  deposition may be signed before any Notary Public.

15

16

17

18

19

20

21

22

23

24

25                        * * * * *

Falzarano Court Reporters

5

---

1            (Deposition commenced:  9:40 a.m.)

2

3            PETER ANDERSON, Deponent,

4  of 3904 W. Durant Court, Wilmington, NC

5  28412, having been previously duly sworn

6  by the Notary Public, was examined and

7  testified further, on his oath, as

8  follows:

9

10           FURTHER EXAMINATION

11

12  BY MR. VERDUCCI:

13      Q    Good morning, Mr. Anderson.

14      A    Good morning.

15      Q    Given the fact as I recall from your earlier

16  time that we spent during depositions I will throw it

17  out to you, do you have any questions regarding the

18  procedures that we follow in the course of depositions

19  this morning?

20      A    No.

21      Q    So you understand, in particular, if I

22  confuse you with a question, you'll let me know that

23  you don't understand it and give me the opportunity to

24  rephrase it?

25      A    Yes.

Falzarano Court Reporters

---

1      Q    Are you under any sort of medication?

2      A    No.

3      Q    So is there anything that would in any way

4  influence your ability to comprehend what's going on

5  this morning and recall the events that we're going to

6  be talking about?

7      A    No.

8      Q    Let me start out with a complaint that was

9  filed by Lieutenant Coleman.  Are you familiar with a

10  1994 EEO complaint that she filed regarding a non

11  selection and performance appraisal?

12      A    Somewhat.

13      Q    Do you recall that she did file an EEO

14  complaint on a performance appraisal and named you as

15  one of the people who had discriminated against her for

16  your part in the performance appraisal?

17      A    I thought it was Commander Wroolie but if you

18  say that's that, then. . .

19      Q    Were you aware of whether or not she

20  prevailed in the EEO complaint that she filed alleging

21  discrimination based on gender and other factors?

22      A    No.

23      Q    Well, I take it then you were never ordered

24  to undergo any type of training related to EEO

25  complaints filed against you?

Falzarano Court Reporters

6

```
1       A    No.
2       Q    Did you ever receive any form of discipline
3   as a result of any EEO complaints that were filed
4   against you?
5       A    Never.
6       Q    Prior to the fall of 2001 did you and
7   Lieutenant Coleman have an agreement not to speak to
8   each other?
9       A    Can you repeat that, after the fall of what?
10      Q    Prior to the fall of 2001 had you and
11  Lieutenant Coleman reached an agreement not to speak to
12  one another?
13      A    Management suggested that's what we do, and
14  we did.
15      Q    Who from management suggested that?
16      A    Mr. Sheridan.
17      Q    Is Mr. Sheridan the one who passed the
18  suggestion along to you?
19      A    Well, Commander Wrcolie said the same thing,
20  he just said, Just ignore her.  Basically everybody
21  said that, all my supervisors.
22      Q    But let me try to distinguish between whether
23  you were given advice not to talk to Lieutenant Coleman
24  versus whether you two had an agreement not to speak to
25  each other.
```

Falzarano Court Reporters

7

```
1            In the fall -- prior to the fall of 2001, had
2   you all reached an agreement through some sort of a
3   mediation not to speak to one another?
4       A    I'm not sure the date.  The mediator came in
5   from Newport and he said he couldn't do nothing and
6   then that's when Sheridan -- that's the only thing I
7   can recall Sheridan said, You don't talk to her and she
8   won't talk to you, you know, and just keep it at that.
9       Q    Were you both present when Mr. Sheridan
10  suggested this?
11      A    I don't recall.
12      Q    Shift your focus to the incident on the gun
13  range and I believe that was October 2001; does that
14  sound about right?
15      A    If you say so.  I'm not particular on the
16  dates.
17      Q    Was there an agreement between you and Miss
18  Coleman at that time not to speak to each other?
19      A    There was -- it was presumed that we wouldn't
20  talk to each other.  In other words, we avoided -- I
21  avoided her.  Don't know -- she told me several times
22  in her things, I don't want to talk to you, I don't
23  want to deal with you, whatever.
24           I don't know the dates.  I mean every day it
25  was the same, like, for me there.
```

Falzarano Court Reporters

8

```
1       Q    Is it fair to say then that this was
2   basically a practice that you both decided not to speak
3   to each other, as compared to an agreement where two
4   people say, Hey, you know what, we're not going to get
5   along, how about I ignore you and leave you alone, you
6   ignore me and leave me alone?
7       A    No, no, I would, I would say I characterize
8   it as if I'm not there and I'm not anywhere near her,
9   then nothing's going to come at me, so it was like an
10  avoidance thing more or less.
11      Q    What did you do on instances when you were
12  unable to avoid Lieutenant Coleman?
13      A    I would tell her, you know, what needed to be
14  done, you know.
15      Q    How successful were you in avoiding contact
16  with Lieutenant Coleman?
17      A    Not very good.
18      Q    Prior to the incident on the pistol range in
19  October of 2001, what kind of contact did you have with
20  her?
21           MR. DeNIGRIS:  Hold on one second.
22           I'm just going to object to the form of the
23           question.  Go ahead.
24           THE WITNESS:  I would, on a daily
25           basis, you know, I would -- she would be in
```

Falzarano Court Re...

9

```
1            the hallway, she'd be out in the parking lot,
2   she'd be at a meeting, in the mail room, you
3   know, mail area, stuff like that.
4   BY MR. VERDUCCI:
5       Q    So when you answer that -- I asked you
6   contact.  What would be your definition of contact in
7   that sense?
8       A    I would be walking by and it would be a
9   "Hee hee," you know, "Ha, ha, ha."  She had some weird,
10  she'd be talking to somebody and she's make some overt
11  comment towards me.  It was like on the low, it wasn't
12  anything, like "Psst, psst" or she'd laugh and she'd,
13  you know, stare at me and that would be about it.
14      Q    From January of 2000 to the present, has
15  Lieutenant Coleman ever touched you in an offensive
16  manner?
17      A    What's the date again?
18      Q    January of 2000.
19      A    She slapped me once; I don't remember what
20  the date was.
21      Q    Did she ever touch you in a sexually
22  suggestive or lewd manner?
23      A    No.
24      Q    To the best of your recollection, how long
25  has it been since this incident in which you said she
```

1    slapped you?
2        A    Some years.  Years.  I've been retired a year
3    and-a-half, so. . .
4        Q    You've been retired since September 21st of
5    2002; is that correct?
6        A    Correct.
7        Q    Do you have an idea how long before your
8    retirement this incident in which Lieutenant Coleman
9    slapped you occurred?
10       A    A year or so.
11       Q    Tell me the circumstances that led to her
12   slapping you.
13       A    You know, I don't really remember; a lot, a
14   lot with her I would just push it to the side or I'd
15   bury it.
16       Q    And why was that?
17       A    Because I had no avenue of escape; it was
18   just building up, building up, building up because
19   nobody would do anything.
20       Q    Between January of 2000 and your retirement
21   in 2002, give me an idea how often within the workplace
22   you heard your colleagues generally, and I mean folks
23   within the security department, speak about sexual
24   matters at work?
25       A    Sometimes it would be several times a day,

1    sometimes it would be days on end where you didn't hear
2    anything.
3        Q    Did you yourself ever engage in those kinds
4    of conversations?
5        A    Can you repeat that question again.
6        Q    Sure.  Did you talk about sexual matters at
7    work?
8        A    No.
9        Q    At any time between January 2000 and your
10   retirement in September 2002 did you talk about sex or
11   sexual matters at work?
12       A    I don't recall.  I would say no, I don't
13   recall.
14       Q    How often did you hear people cursing at work
15   during that same period of time, January 2000 through
16   your retirement in 2002?
17       A    Constantly.
18       Q    When you heard people talking about sexual
19   matters, was it normal to hear them cursing within the
20   context of sexually lewd language as well?
21       A    No.
22       Q    Now you've indicated that you heard folks
23   talk about sexual matters at work but, let me ask, when
24   you heard these, were you part of a group of people
25   when you heard someone speaking about sexual matters?

1        A    No, walking by.
2        Q    So were you ever part of discussions that
3    involved sexual matters?
4        A    Did you use the word ever or --
5        Q    Between --
6        A    Between a time frame.
7        Q    Between January of 2000 and your retirement.
8        A    No, I don't recall.
9        Q    Let me try and ask whether your answer is no
10   or you don't recall?
11       A    No, I don't recall any.
12       Q    So is it fair to say that it's possible that
13   you engaged in these kinds of conversations but just
14   don't recall them?
15       A    I, I doubt it.  I would say no.
16       Q    On how many occasions, if any, did you take
17   action to break up these discussions when you overheard
18   them?
19       A    On numerous occasions I spoke to the people,
20   say that's inappropriate at work; and, taking it
21   further than that, nothing was ever done so it wasn't
22   worth turning anybody in.
23       Q    So is it fair to say that you instructed
24   people to stop but never took any formal or greater
25   informal disciplinary action against them?

1        A    I couldn't, first of all; so, yes.
2        Q    Did you ever initiate any formal disciplinary
3    action against people who you overheard using lewd or
4    suggestive language?
5        A    Yes.
6        Q    When was the last time that occurred?
7        A    The last time was, I took action when I was
8    in charge was when, on Coleman.
9        Q    Tell me what the circumstances were.
10       A    Letter, reprimand or something.
11       Q    But regarding what; what was going on that
12   you --
13       A    I was --
14            MR. DeNIGRIS:  Let he him finish the
15       question, please.
16            THE WITNESS:  I understand.
17   BY MR. VERDUCCI:
18       Q    What led you to take disciplinary action?
19       A    She was being disciplined for a previous,
20   another incident and she started cussing, swearing,
21   motherfucker, I'm going to get you, you know, this
22   ain't over, spitting, throwing papers.  Master Chief
23   Sheldon was there and so she got another letter.
24       Q    Did you take any action against Lieutenant
25   Coleman or any other person regarding lewd, sexually

STATE OF CONNECTICUT

1. I, DEBORAH A. STEDMAN, a Notary Public, duly
commissioned and qualified in and for the State of
Connecticut, do hereby certify that pursuant to
Agreement there came before me on the 4th day of
May, 2004, the following named person, to wit:
Peter Anderson, who was by me duly sworn to testify to
the truth and nothing but the truth; that he was
thereupon carefully examined upon his oath and his
examination reduced to writing under my supervision;
that this deposition is a true record of the testimony
given by the witness.

I further certify that I am neither attorney nor
counsel for, nor related to, nor employed by any of the
parties to the action in which this deposition is
taken, and further, that I am not a relative or
employee of any attorney or counsel employed by the
parties hereto, or financially interested in this
action.

IN WITNESS THEREOF, I have hereunto set my hand
this 24th day of ___May___, 2004.

_____
Deborah A. Stedman
LSR #261
Notary Public

My Commission Expires:  September 30, 2007.

Falzarano Court Reporters

I N D E X

| WITNESS | PAGE |
|---|---|
| Peter Anderson | |
| Further Examination by Mr. Verducci | 4 |
| Further Examination by Mr. De Nigris | 89 |
| Further Examination by Mr. Verducci | 91 |

Falzarano Court Reporters

Anderson vs Johnson

2/27/2004                                                      Pamela Coleman

Page 1

```
 1                   UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
 2


 3        - - - - - - - - - - - - - - - - - - - - - - - - -
          PETER ANDERSON, ET AL,          )
 4                      Plaintiffs,        )
                                           )
 5                 Vs                      )
                                           )
 6        HANSFORD T. JOHNSON, Acting )
          Secretary of the Navy,      ) 3:03CV116(MRK)
 7                      Defendant.         )
          - - - - - - - - - - - - - - - - - - - - - - - -
 8


 9


10


11


12        - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                        Deposition of: PAMELA COLEMAN
          - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
13


14


15


16


17          Taken before Tina M. Davis, Stenographer and
          Notary Public in and for the State of Connecticut,
18        pursuant to notice, at the offices
          of UNITED STATES ATTORNEY'S OFFICE, 450 Main Street,
19        Hartford, Connecticut, on Friday, February 27, 2004
          scheduled to commence at approximately 10:00 a.m.
20


21


22


23                        Tina M. Davis
                          Court Reporter
24              Brandon Reporting Service
                       44 Capitol Avenue
25               Hartford, CT   06106
                      (860) 549-1850
                          EXHIBIT B
```

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

Anderson vs Johnson

Page 10

1    until counsel gets their objection on the record.  Okay?

2        A.  Okay.

3        Q.  Also, as you're sitting here today, are you

4    taking any type of medication at all that would prevent

5    you from accurately recalling events or affecting your

6    memory at all or anything like that?

7        A.  No.  I take drugs -- not drugs.  Prescription

8    drugs, but it's not -- and not narcotics.

9        Q.  Okay.  Great.

10       A.  Not narcotics.

11       Q.  That's all I have to say then.  Okay?

12       A.  Yes.

13       Q.  Let's proceed.

14           Would you state your name for the record,

15   please?

16       A.  Pamela L. Coleman.

17       Q.  Where are you employed, ma'am?

18       A.  At the Naval Submarine Security Department,

19   submarine base security department.

20       Q.  How long have you been employed there?

21       A.  About 17 and a half years.

22       Q.  How long have you held the rank of lieutenant?

23       A.  I think since 1998.

24       Q.  Now, when you say that you were at the -- you've

25   been at the naval base for 17 years, has that 17 years

Anderson vs Johnson

Page 11

1    been completely as a police officer?

2        A.   No.   One year there was a RIF, and I was RIF'd to

3    a payroll position.

4        Q.   Why don't we -- what was the actual year of hire

5    that you came on board at the -- it's a submarine base;

6    is that correct?

7        A.   Right.   1986.   Right.

8        Q.   What rank did you hold when you came on that

9    base?

10       A.   Guard.

11       Q.   Was that a Series 085 guard?

12       A.   Right, correct.

13       Q.   At what point -- I'll ask you what was the next

14   position that you held after guard?

15       A.   Corporal.

16       Q.   Corporal.

17            Was that a Series 085 or a Series 083 police

18   officer at that point?

19       A.   85.

20       Q.   It was still an 85?

21       A.   (Witness nods head in the affirmative.)

22       Q.   Okay.   After that position then what did you

23   hold?

24       A.   Police officer.

25       Q.   Okay.   Was that a Series 083 police officer,

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc41

Anderson vs Johnson

Page 12

1    then?

2        A.  Yes, it was.

3        Q.  So you changed at that point --

4        A.  Right.

5        Q.  -- from a different series to the police officer

6    series?

7        A.  Correct.

8        Q.  Approximately what year was that?

9        A.  '88, 1988.

10       Q.  What was the next position that you held after

11   that?

12       A.  Sergeant.

13       Q.  What time frame was that?

14       A.  I don't know.  I think it was in 1989.

15       Q.  Again, when were you -- and you held that

16   position as sergeant until you were promoted to

17   Lieutenant?

18       A.  In realty, yes.

19       Q.  Okay.  You said there was a break in -- there was

20   a RIF, Reduction in Force, at that point?

21       A.  Well, I also had been demoted, and I won a suit,

22   EEO complaint.

23       Q.  Well, we'll get into all that.  Okay?

24       A.  Well, you asked me.  I'm just trying to explain.

25       Q.  Okay.  Not a problem.

Brandon Smith Reporting

e3aecd0c-33ed-4c:

Anderson vs Johnson

eman

```
 1           Let's go through your ranks at this point.

 2      A.  Okay.

 3      Q.  So around what year was the reduction in force?

 4      A.  '95 I think.

 5      Q.  And you were a sergeant at that time?

 6      A.  No.  I was a lieutenant.

 7      Q.  You were a lieutenant.

 8      A.  No.  Wait a minute.  I was a sergeant.  Yes,

 9   that's right.

10      Q.  At what point -- do you remember what specific

11   time frame you came back from the reduction in force

12   back into the police force?

13      A.  '96.

14      Q.  '96.

15           Was that as a sergeant or as a lieutenant?

16      A.  It was a sergeant.

17      Q.  Okay.  There haven't been any other reduction in

18   force since 1996, have there?

19      A.  No.

20      Q.  And you may have answered this in our course,

21   but, again, what year were you promoted to lieutenant?

22      A.  I think it was '98.

23      Q.  All right.  That's the position that you

24   currently hold today?

25      A.  Correct.
```

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

Anderson vs Johnson

Page 20

```
 1      Q.   Nine.  Do you know what the basic strength for

 2   the civilian force is there?

 3      A.   I think it's 33.

 4      Q.   33.

 5           Do you have any idea of how many men versus how

 6   many women are in the civilian side of the police

 7   force?

 8      A.   Yes.  There's two other -- two females, and the

 9   rest are males.  That's civilian only.

10      Q.   But they're sworn personnel; is that correct?

11      A.   Nobody is sworn in this department.

12      Q.   In other words, they -- well, let me -- maybe my

13   idea of sworn is little bit different than yours.  They

14   wear a badge and carry a firearm?

15      A.   Correct.

16      Q.   They can make an arrest?

17      A.   Correct.

18      Q.   Okay.  Now, what's the rank structure in the

19   police department right now?

20      A.   It goes from corporal, which is a field training

21   officer, and sergeant, lieutenant, and the next billet

22   for civilian would be the public safety director.

23      Q.   How many females are there in the ranks of

24   sergeant or above?

25      A.   None.
```

Brandon Smith Reporting

Anderson vs Johnson

2/27/2004                                            Pamela Coleman

Page 21

```
1      Q.  You're the only one; is that correct?

2      A.  I'm the only female supervisor.

3      Q.  Supervisor.

4      A.  For civilians.

5      Q.  So there's no females in the rank of sergeant; is

6   that correct?

7      A.  Correct.

8      Q.  And you're the only female in the rank of

9   lieutenant?

10     A.  Correct.

11     Q.  Is there anybody that holds the rank of captain

12  there now?

13     A.  Nobody.

14     Q.  Now, did there ever come a time since you've been

15  either a sergeant or a lieutenant that you have reached

16  out personally to the EEO counselors or the EEO office

17  for guidance on any EEO types of matters or complaints

18  that have come across your desk?

19     A.  Rephrase that, please.

20     Q.  You didn't understand the question?

21     A.  No.

22     Q.  Okay.

23     A.  I personally or somebody that worked for me or

24  did I have a problem with somebody?

25     Q.  Well, have you received -- well, let me break it
```

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

· Anderson vs Johnson

2/27/2004                                                    Pamela Coleman

Page 54

1      A.  I filed a lot of EEO complaints.

2      Q.  All right.  What was the next one?

3      A.  I don't -- the next one, I think it was against

4  the letter of reprimand, I think.  I'm not sure.  I

5  don't recall.

6      Q.  You don't recall much of anything about that

7  complaint.  Do you remember how it turned out?

8      A.  Yeah.  I think they found in the Navy's favor, if

9  I remember correctly.

10     Q.  Okay.  When you say they found in the Navy's

11 favor, would it be a fair statement to say that they

12 found no discrimination there?

13     A.  I don't know.  I didn't read the report.

14     Q.  Okay.  Nobody provided you with any indication of

15 the resolution of your complaint?

16     A.  Indication.  But never with the real outcome,

17 what the judge had -- or what the investigator had

18 ruled.  Just that they didn't find that the Navy

19 discriminated.  That's all.

20     Q.  And you didn't take any further appeal over that

21 one?

22     A.  No.

23     Q.  Was there any other EEO complaints that you

24 remember after that?

25     A.  Yes, there was.  I filed one back in '98.  I

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

Anderson vs Johnson

Page 55

1    think it was on Commander Stafford, who was a public

2    safety officer, and Pete Anderson there for making

3    derogatory remarks and harassment.

4        Q.  Okay.  What was the outcome of that one?

5        A.  Came back in my favor, and they awarded me money

6    and made recommendations on training for Anderson and

7    the public safety officer.

8        Q.  How much money were you awarded?

9        A.  $5,000.

10       Q.  Was that as an out-of-court settlement, or was

11   that as a result of a lawsuit?

12       A.  No.  That was an EEO -- that came from the -- the

13   Secretary of the Navy.  The judge awarded it, and the

14   Navy agreed with it and paid it.

15       Q.  Was there anything else?

16       A.  There could have been, but the most recent one

17   is -- since then, if I remember correctly, this is the

18   most recent one I filed on the suspension.

19       Q.  Are you familiar with the fact that there was a

20   hotline investigation report from 200- --

21           MR. ANDERSON:  I think it's one or two.  It

22   was one.

23           MR. DE NIGRIS:  Yeah.

24   BY MR. DE NIGRIS:

25       Q.  Were you interviewed at all as part of an agency

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

Anderson vs Johnson

2/27/2004                                                         Pamela Coleman

Page 58

```
 1                    MR. DE NIGRIS:  Sure.

 2

 3                    CROSS EXAMINATION

 4

 5   BY MR. VERDUCCI:

 6        Q.  Lieutenant Coleman, as a lieutenant were you at

 7   all times that you worked at the sub base junior to the

 8   plaintiff Captain Anderson?

 9        A.  Yes, I was.

10        Q.  Did you hear him at work talk about his own

11   personal sexual activity?

12        A.  Yes.  At times.  Not blatantly.

13        Q.  Did you hear him curse at work?

14        A.  Yes, I did.

15        Q.  Did he ever proposition you to engage in sexual

16   relations?

17        A.  He sexually harassed me for years.  Yes, he did.

18        Q.  But specifically did he ever proposition --

19        A.  Yes.

20        Q.  -- you to have sex with him?

21        A.  Yes, he did.

22        Q.  Now, did Captain Anderson ever orally counsel you

23   or ask you to stop cursing?

24        A.  Yes.

25        Q.  Did he ever orally counsel you or ask you to stop
```

Brandon Smith Reporting

e3aecd0c-33ed-4cae

Anderson vs Johnson

Page 59

1    talking about sexual matters?

2        A.  Absolutely not.

3        Q.  Now, when you spoke before about Pete Anderson,

4    were you referring to the plaintiff --

5        A.  Yes.

6        Q.  -- in this case?

7        A.  He's no longer employed.

8        Q.  Was he specifically one of the people against

9    whom you filed an EEO complaint?

10       A.  Yes.

11       Q.  Did that also include a performance appraisal

12   that he signed?

13       A.  Yes, it did.

14       Q.  Did an administrative judge find in your favor

15   that there was discrimination in that case?

16       A.  Absolutely.

17       Q.  Do you recall whether it was some time in 2002

18   that the finding of discrimination was actually

19   issued?

20       A.  Yes, it was.

21       Q.  Now, with regard to Officer Kujawski, have you at

22   all times been senior to Officer Kujawski?

23       A.  Yes, I have.

24       Q.  Was he ever on your shift?

25       A.  Absolutely not.

Brandon Smith Reporting

Anderson vs Johnson

2/27/2004

Pamela Coleman

Page 60

1    Q.  Did you ever have personally supervisory

2    responsibility over him?

3    A.  No, I did not.

4    Q.  Is it fair to say that on average your contact

5    with him was an hour or so per week?

6    A.  About an hour a week, yes.

7    Q.  Now, did Officer Kujawski ever approach you

8    seeking information about professional police officer

9    matters?

10   A.  Yes, he did.

11   Q.  Did you ever orally counsel Officer Kujawski

12   about his cursing in the workplace?

13   A.  No, I did not.

14   Q.  Have you read statements that he signed

15   acknowledging his own cursing in the workplace?

16   A.  Yes.  He has the propensity to use the word

17   "fuck" every day in his daily language.

18   Q.  Now, did he make that statement under oath?

19   A.  Yes, he did.

20   Q.  Now, did you have a conversation with

21   Mr. Sheridan about Officer Kujawski's long-term

22   assignment to the armory and training department?

23   A.  Yes, I did.

24   Q.  What was the purpose of that conversation?

25   A.  There were complaints from employees that he was

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1

Anderson vs Johnson

2/27/2004                                              Pamela Coleman

Page 61

1    being given preferential treatment, so I went to

2    Mr. Sheridan and I told him.  And I told him also that

3    he was coming up on a two-year mark, and if he stayed

4    beyond two years that he would probably get the job by

5    default or something to that effect.

6        Q.  Okay.  Now, Mr. Sheridan, he was in charge of the

7    security department at that time?

8        A.  Yes, he was.

9        Q.  So was it your understanding that if

10   Officer Kujawski stayed in the position outside the

11   police office position for two years that he would be

12   able to reclassify?

13       A.  Yes.

14       Q.  Now, did Officer Kujawski ever come to you and

15   tell you that -- talk to you about your use of profanity

16   at work?

17       A.  Absolutely not.  He cussed and swore worse than

18   anybody in the department, and still does.

19       Q.  Did Officer Kujawski ever come to you and talk to

20   you about -- complain about you speaking about personal

21   or in general sexual matters in the workplace?

22       A.  Never ever approached me on it.

23       Q.  Now, you did supervise Sergeant Wells for a short

24   period of time; is that correct?

25       A.  Correct.

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

Anderson vs Johnson

2/27/2004                                                      Pamela Coleman

Page 62

1    Q.  To the best of your recollection, approximately

2    how many weeks were you his -- first his supervisor?

3    A.  Oh, I checked my records last night.  I think it

4    was, like, five months.

5    Q.  Did you ever orally counsel Sergeant Wells about

6    his cursing in the workplace?

7    A.  Yes.

8    Q.  Did you ever orally counsel Sergeant Wells about

9    his wishing ill on others?

10   A.  Yes.  He has the propensity to wish -- excuse my

11   English -- ass cancer on people.  He does it

12   consistently, and I counseled him and told him that it

13   would come back to him wishing death on people.

14   Q.  Did Sergeant Wells ever tell you that he found

15   your cursing to be offensive --

16   A.  Never.

17   Q.  -- or inappropriate?

18   A.  Never.

19   Q.  Did Officer Wells ever talk to you about your

20   discussing sexual matters at work?

21   A.  Never.  Because I didn't discuss it.

22   Q.  That's my next question.  Did you ever discuss

23   your own personal sexual relations or activity at

24   work?

25   A.  Never.  I don't talk about my personal business.

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

Anderson vs Johnson

2/27/2004

Pamela Coleman

Page 63

1    Q.  And during the -- except for those five months or

2    so when you were Sergeant Wells's supervisor, how would

3    you describe the amount of daily contact you had with

4    him when he was on someone else's shift?

5    A.  Limited.  Maybe 15 -- not -- ten minutes maybe.

6    You mean if he worked for somebody else; is that the

7    question?

8    Q.  Yes.

9    A.  When he was working for somebody else, ten

10   minutes maybe.  Not even that.  Five minutes.

11   Q.  Now, is there still cursing that goes on at the

12   workplace at the security department above the sub

13   base?

14   A.  There is cursing every day.  24 hours, seven days

15   a week you can walk in that department and hear F this,

16   F that.  And by some of these individuals here.  Every

17   day.

18   Q.  Have you heard Officer Kujawski curse at work?

19   A.  Every day.  And I went chain of command, and I

20   told my boss the next time I catch him using profanity I

21   was filing a complaint.

22   Q.  Have you spoken to Lieutenant Cothran about his

23   cursing in the workplace?

24   A.  Yes, I have.

25   Q.  What about Captain Anderson --

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

Anderson vs Johnson

2/27/2004                                    Pamela Coleman

Page 64

1     A.   No.

2     Q.   -- have you --

3     A.   No.   He was superior to me.

4     Q.   Did you hear him curse in the workplace?

5     A.   Yes, I did.   Not frequently, but he cursed.

6     Q.   I believe we've already talked about

7   Sergeant Wells.

8         Tell me about your own use of profanity in the

9   workplace.   How has it changed over the years?

10    A.   I cursed just like the best -- just like a sailor

11  curses.   I curse just like everybody else.   But I have

12  not used profanity, maybe a slip here and there.   In the

13  last couple years I have really -- and I've been told

14  that they can't believe that I have not.

15        But I have to continually every day tell sailors

16  and some of my people about the F word, because it's so

17  prevalent and it's just so acceptable that --

18  personally, no.

19    Q.   Finally, what percentage of military personnel

20  are there in the security department?

21    A.   Oh, there's 75 percent to us.   25 percent

22  civilian, 75 percent military.

23    Q.   Is there a policy, to the best of your

24  knowledge, in the security department in place against

25  profanity?

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

Anderson vs Johnson

Page 69

```
 1                    STATE OF CONNECTICUT

 2

 3     I, Tina M. Davis, Notary Public, duly commissioned

 4   and qualified in and for the State of Connecticut, do

 5   hereby certify that pursuant to notice there came before

 6   me on Friday, February 27, 2004, the following-named

 7   person to wit: PAMELA COLEMAN, who was by me duly sworn

 8   to testify to the truth and nothing but the truth; that

 9   she was thereupon carefully examined upon her oath and

10   her examination reduced to writing under my supervision;

11   that this deposition is a true record of the testimony

12   given by the witness.

13     I further certify that I am neither attorney nor

14   counsel for nor related to nor employed by any of the

15   parties to the action in which this deposition is taken,

16   and further that I am not a relative or employee of any

17   attorney or counsel employed by the parties hereto, or

18   financially interested in this action.

19     IN WITNESS THEREOF, I have hereunto set my hand this

20   16th of March 2004.

21

22

23   _____

24   Tina M. Davis, Notary Public

25   My Commission Expires: September 30, 2006
```

Brandon Smith Reporting

e3aecd0c-33ed-4cae-82db-fe1de4fc418f

Anderson vs Johnson

2/27/2004                                                              Pamela Coleman

Page 70

```
 1                              JURAT

 2

 3     I, PAMELA COLEMAN, do hereby certify that the

 4   foregoing testimony is true and accurate to the best of

 5   my knowledge and belief.

 6

 7

 8

 9

10

11

12

13   _____        _____

     DATE                             PAMELA COLEMAN
14

15

16   At _____ in said County of _____ ,

17   this _____ day of _____, 2004, personally

18   appeared PAMELA COLEMAN and she made oath to the truth

19   of the foregoing answers by her subscribed.

20

21   Before me, _____ Notary Public.

22

23   My Commission Expires: _____

24

25                                                     td
```

Brandon Smith Reporting

e3aecd0c-33ed-4cae-820b-fe1de4fc418f