UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

# ORIGINAL

- - - - - - - - - - x
PETER ANDERSON, et al,
              Plaintiffs,    |   Civil Action No.
                              |   3:03CV116(MRK)

           vs.           |

GORDON R. ENGLAND, SECRETARY  |
OF THE NAVY,                 November 5, 2003
            Defendant.   |
- - - - - - - - - - x

### DEPOSITION OF CHRISTOPHER WELLS

Taken before Deborah Stedman, LSR #261, a
Court Reporter and Notary Public, within
and for the State of Connecticut,
pursuant to Notice and the Federal Rules
of Civil Procedure, at the Naval Submarine
Base New London, Groton, Connecticut, on
November 5, 2003, commencing at 2:44 p.m.

FALZARANO COURT REPORTERS
117 N. Saddle Ridge
West Simsbury, CT   06092
860.651.0258

EXHIBIT C-1

1    Q    As you know, our court reporter can take down
2  everything that we say and since she is taking down
3  everything that we say, I'd ask that you wait until
4  I've completed the question before you begin to respond
5  or to tell me that you don't understand it so we keep
6  from confusing her, okay?
7    A    I understand.
8    Q    And finally you understand that your
9  testimony today is being given under oath as if you are
10  in court and, therefore, subject to the penalty of
11  perjury?
12    A    Yes.
13    Q    Very well.  When did you begin to work aboard
14  the New London sub base as a police officer?
15    A    Initially as the position was, it was guard
16  and that was nineteen -- winter of 1988.  As a police
17  officer, it was about 1991 or '92.
18    Q    Have you been employed aboard the sub base as
19  a police officer continuously since 1991?
20    A    Yes.
21    Q    Now in going through the administrative
22  record, there is an indication that you filed or were
23  part of a group of people who filed an EEO complaint
24  some time prior to 2001 regarding an overtime issue?
25    A    Yes.

Falzarano Court Reporters

8

1    Q    Who were the people that you joined in filing
2  an EEO complaint?
3    A    Initially the persons were all the
4  supervisory sergeants and
5  lieutenants except for one.
6    Q    Okay.  Who was that one?
7    A    Lieutenant Coleman.
8    Q    You said that initially it was everyone
9  except for Lieutenant Coleman.  Did the group of people
10  who you were a part of, those shift supervisory
11  lieutenants and sergeants, change over the course of
12  that filing?
13    A    Yes.
14    Q    How did it change?
15    A    Um, one of the sergeants took -- settled,
16  for instance.  I know one sergeant settled.  One
17  lieutenant, I don't know whether he settled or not but
18  subsequently dropped from the same group of people that
19  were making the complaint.
20    Q    Very well.  Who was the or what was the
21  subject of that 2000 complaint?
22    A    Previously all supervisors as well as all
23  bargaining unit members received 13 minutes of overtime
24  per day, five days a week, to arm up, prepare for
25  shift, include clothing, et cetera.  The supervisors

Falzarano Court Reporters

9

1  specifically received it to do the paperwork in
2  preparation for the shift starting that day.  Getting
3  documents together for that day that had been written
4  up, orders for that day that were pertinent, changes in
5  -- changes in duties that were pertinent; such as, if
6  special guests were appearing or coming by, we had to
7  know about these matters, or if there was drill we had
8  to know about these.  That was 13 minutes a day except
9  for Lieutenant Coleman.
10    Lieutenant Coleman received 30 minutes a day.
11  When we, when all the other supervisors found out about
12  it, we went over -- well, we talked with the chain of
13  command initially, then we went over and filed an EEO
14  complaint.  This over a period of, I am going to guess,
15  weeks, we filed an EEO complaint.
16    Q    How was that EEO complaint resolved?
17    A    The executive director, which is the civilian
18  person in charge of the base, said that no one would
19  get any overtime.  The chain of command would change
20  their minds, said that only the lieutenant got the
21  overtime, only that lieutenant got the overtime, no
22  lieutenant would get the overtime, no one got the
23  overtime.  It changed constantly.
24    End result was no one got the overtime.  One
25  sergeant was I think settled and everyone else

Falzarano Court Reporters

1  continued to make the complaint.
2    Q    Okay.  What ultimately happened to the
3  complaint?
4    A    We are here today.  People joined and it
5  changed from just being a complaint regarding the
6  sexual discrimination shown by the chain of command and
7  the harassment that continued from that to more
8  harassment than anything else.
9    Q    Okay, the complaint that you filed in the
10  summer of 2000 regarded overtime only, correct?
11    A    Discrimination.
12    Q    Right, but based on a policy that the command
13  was following that paid a female supervisor more
14  overtime than male supervisors, correct?
15    A    Yes.
16    Q    Now what happened to that administrative
17  complaint, did you prevail, was there a finding of
18  discrimination or no discrimination?
19    A    I don't know.
20    Q    Okay.  In the spring of 2001, specifically in
21  March of 2001 you were notified by Lieutenant Cothran
22  that Lieutenant Coleman would be taking over the shift
23  that you were working on, correct?
24    A    I am not sure of the dates but essentially
25  correct.

Falzarano Court Reporters

1    Q    So from January of 2000 through the beginning
2  of March 2001 which shift were you assigned to?
3    A    Now you are asking me dates.  Uhm, I do not
4  recall if I was on swing shift or -- second shift or
5  first shift, one of the two.
6    Q    But your shift supervisor was whom?
7    A    Was Lieutenant Cochran.
8    Q    When you learned that Lieutenant Coleman was
9  going to be the shift supervisor, you decided to file
10  an EEO complaint, correct?
11    A    Correct.
12    Q    Now, wasn't that the first complaint in which
13  you alleged that Lieutenant Coleman had done something
14  to you?
15    A    No, incorrect.
16    Q    What earlier complaint did you allege that
17  Lieutenant Coleman had acted towards you in some
18  manner?
19    A    How far back do you want to go?
20    Q    EEO complaints.  You had filed a previous EEO
21  complaint against Lieutenant Coleman?
22    A    I filed or made complaints with the chain of
23  command repeatedly.
24    Q    Let me apologize and try and be more clear.
25  I am only talking about complaints to the EEO officer

1  on base.
2    A    To the EEO office?
3    Q    Correct.  Had you filed a complaint alleging
4  that Lieutenant Coleman had acted illegally toward you
5  prior to the complaint that you made contact on in
6  March of 2001?
7    A    Not to the EEO office.
8    Q    Thank you.  Now, have you filed a complaint
9  with the EEO office about Lieutenant Coleman's conduct
10  towards you subsequent to the complaint that you filed
11  in March or April of 2001?
12    A    Yes.
13    Q    What was the date that that complaint
14  occurred?
15    A    I do not recall the exact date.  I can tell
16  you it was within approximately a year from now --
17  past.
18    Q    In April of 2001 -- I am sorry, in March of
19  2001 again shortly after you learned that Lieutenant
20  Coleman was going to be your supervisor you made
21  contact with the EEO office, correct?
22    A    I really can't tell you an absolute "yes" or
23  "no."  Probably.
24    Q    Let me show you pages 19 and 20 of the Record
25  of Investigation on that administrative complaint.  Do

1  you recognize those pages, 19 and 20?
2    A    Yes.
3    Q    Who filled those pages out?
4    A    This probably is one of the EEO officers
5  initial or handwriting, I am guessing.
6    Q    Whose initials are on page 20?
7    A    Mine.
8    Q    Whose signature is on page 20?
9    A    Mine.
10    Q    Did you speak to the EEO officer who filled
11  out that page, those pages with you?
12    A    T. Smith, I am sure I did.
13    Q    What was the bases that you indicated for
14  your claim of discrimination?
15    A    Explain.
16    Q    Turn to page 19.  You complained that
17  Lieutenant Coleman, being assigned to your shift,
18  discriminated against you because of what bases?
19    A    It says reprisal, previous complaint.
20    Q    Okay, and what else?
21    A    Harassment.  Lists here other issues,
22  harassment and overtime pay; or "pay including
23  overtime" is the actual term it used there.
24    Q    With regard to harassment it specifically
25  indicated non sexual harassment, correct?

1    A    Does it say there?  It does say that.
2    Q    And there was an opportunity -- I am sorry.
3    A    I don't necessarily agree that that's what he
4  actually meant to check but it does say that.
5    Q    Now, you filed a statement in conjunction
6  with your affidavit -- I mean in conjunction with your
7  complaint, correct?
8    A    If that is the procedure, I would certainly
9  assume so.  There's a lot of paperwork involved.
10    Q    Well, who would have written -- never mind.
11  Let me change that.
12      In the course of an investigation someone
13  took your affidavit?
14    A    Yes.
15    Q    And in reviewing the affidavit in this
16  complaint was that you did not want to work for
17  Lieutenant Coleman, correct?
18    A    Correct.
19    Q    And isn't it true that what you were doing
20  was anticipating that she would harass you?
21    A    Is it anticipation to think that the sun's
22  going to rise tomorrow morning?  If so, as an analogy,
23  that's a similar analogy.
24    Q    Take a look at pages 42 and 43 and that's
25  your affidavit, correct?

22

1    Let me show you a certified mail receipt and
2 is that your signature?
3    A    Yes.
4    Q    What date does that indicate you received
5 certified mail from the Navy?
6    A    It looks to be like 10 something, there's a
7 squiggle.  I couldn't tell you what that means.
8    Q    What year?
9    A    That might be a three at the end maybe.  Can
10 you tell me what that squiggle is?
11    Q    Not my handwriting, so I won't.
12    A    That's not mine.
13    Q    That's not your handwriting?
14    A    No, it's not my handwriting.
15    Q    You are not the person that signed?
16    A    That's my initials here.  That's my initials
17 or at least that looks like my initials here.  This is
18 not my handwriting.
19    Q    Okay, the signature on the certified mail
20 receipt, whose is that?
21    A    Mine.
22    Q    Okay.  Now, what GS grade police officer were
23 you when you made contact in the -- in March of 2001 on
24 that EEO complaint?
25    A    Supervisory, GS-7.

23

1    Q    How long a period of time did you work on
2 Lieutenant Coleman's shift?
3    A    Estimation, less than six months.  I am going
4 to say between three and six months.
5    Q    Would you be surprised if it was only six
6 weeks?
7    A    Yes, actually.  I know I made a lot of noise
8 to get off the shift.
9    Q    What shift was that?
10    A    That was -- she was running, she was running
11 swing shift at the time, second shift.
12    Q    Who was responsible for reassigning you off
13 of the swing shift?
14    A    I don't know.  I don't know who in the chain
15 of command made that decision.
16    Q    Who notified you?
17    A    The entire chain of command notified me so it
18 was probably finally the operations commander, chief.
19 Which chief, again, I am not sure, we change a lot.  A
20 lot of chiefs have come and gone.  That may have been
21 -- that may have been Carlberg.
22    Q    Can you spell Carlberg?
23    A    C-a-r-l-b-e-r-g.
24    MR. De NIGRIS:  Just for the record
25    purposes, is that one name or two names?

24

1    THE WITNESS:  One name.
2 BY MR. VERDUCCI:
3    Q    That's just the last name?
4    A    His last name.  I am not positive if that was
5 him.
6    Q    How did you go about seeking a reassignment
7 off of that shift?
8    A    I complained to my chain of command
9 initially.
10    Q    Who specifically?
11    A    The operations chief initially, that was the
12 first person I saw.  I talked to my shift lieutenant at
13 the time which was Lieutenant Cothran.  After him, the
14 operations chief.  After him, I ended up, end result, I
15 ended up seeing the security officer at the time, who
16 was a -- I think he was still a warrant officer,
17 Gardner.  I believe he was still a warrant officer.  I
18 don't think he's a warrant officer anymore but at the
19 time I saw him.  He was the last person I ended up
20 seeing to get reassigned off of that shift.
21    Q    How much time passed from when Lieutenant
22 Cothran told you that Lieutenant Coleman would be
23 taking over the shift until she actually took over the
24 shift?
25    A    I think it was like a week; may have been

25

1 two.  Normally we do things on a pay period.
2    Q    What steps did you take during the period of
3 time that Lieutenant Coleman was your supervisor to
4 follow up on your reassignment request?
5    A    I don't -- dealt with the chain of command.
6    Q    How?
7    A    Go in and talk to them or send them e-mails.
8    Q    Do you have any of those e-mails?
9    A    Probably.
10    Q    Now in terms of the complaint that I showed
11 you, the one from April of 2001, have you filed any
12 formal complaints of discrimination with the EEO office
13 since April of 2001?
14    A    Yes, approximately a year ago which is now
15 coming up for a deposition.
16    Q    What's the status of that complaint?
17    A    It's getting ready to come up for deposition.
18    Q    When you say --
19    A    They've hired a or brought in an
20 investigator, the person that -- just like what wrote
21 some of this other -- this one that I noticed the pages
22 in there; the woman comes in, take a, take a statement.
23 That happens in about a week and-a-half.
24    Q    So there is a formal complaint pending?
25    A    Correct.

CROSS-EXAMINATION

BY MR. De NIGRIS:

Q   On your proposed suspension, Chris, how did that come about, what was the -- who started that investigation?

A   My opinion is Lieutenant Coleman started that investigation.

Q   Well, is it your opinion or do you know specifically?

A   Specifically, no, I do not know.  It is my opinion based upon several, several facts.

MR. De NIGRIS:  I don't have any further questions either.

MR. VERDUCCI:  Thank you very much, you are excused.  We are going to reserve the right to continue at some future time.

(Deposition adjourned:  3:38 p.m.)

Falzarano Court Reporters

STATE OF CONNECTICUT

I, DEBORAH A. STEDMAN, a Notary Public, duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Agreement there came before me on the 5th day of November, 2003, the following named person, to wit: Christopher Wells, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this 20th day of November, 2003.

Deborah A. Stedman
LSR #261
Notary Public

My Commission Expires:  September 30, 2007.

Falzarano Court Reporters

36

I N D E X

WITNESS                                          PAGE

Peter Anderson

    Direct Examination by Mr. Verducci            4
    Cross-Examination by Mr. De Nigris            34

Falzarano Court Reporters

ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


- - - - - - - - - x
PETER ANDERSON, et al,
         Plaintiffs,   |  Civil Action No.
                        3:03CV116(MRK)
         vs.         |

GORDON R. ENGLAND, SECRETARY  |
OF THE NAVY,             Mar 4, 2004
         Defendant.   |
- - - - - - - - - x


DEPOSITION OF CHRISTOPHER WELLS
Volume 2


Taken before Deborah Stedman, LSR #261, a
Court Reporter and Notary Public, within
and for the State of Connecticut,
pursuant to Notice and the Federal Rules
of Civil Procedure, at the Naval Submarine
Base, Groton, Connecticut, on May 4, 2004,
commencing at 12:15 p.m.


FALZARANO COURT REPORTERS
117 N. Saddle Ridge
West Simsbury, CT  06092
860.651.0258


EXHIBIT C-2

1 APPEARANCES:

2     For the Plaintiffs:

3         LAW OFFICES OF STEPHEN G. DE NIGRIS
        2100 M Street N.W., Suite 170-283
4         Washington, D.C.  20037-1233
        800.791.9908  (Phone)
5         888.791.4441  (Fax)
        By:  STEPHEN G. DE NIGRIS, ESQ.

6

7     For the Defendant:

8         UNITED STATES ATTORNEY'S OFFICE
        450 Main Street
9         Hartford, CT  06103
        860.947.1101
10         By:  LISA E. PERKINS, ESQ.
            Assistant United States Attorney
11         -and-

12         OFFICE OF CIVILIAN HUMAN RESOURCES
13         321 Somers Court, N.W., Suite 40103
        Washington, D.C.  20393-5441
14         202.764.0694
        By:  ANTHONY J. VERDUCCI, ESQ.

15

16     Also Present:

17         MR. PETER ANDERSON

18

19

20

21

22

23

24

25

4

---

1     S T I P U L A T I O N S

2

3        It is stipulated by counsel for the

4 parties that all objections are reserved until the time

5 of trial except those objections as are directed to the

6 form of the question.

7        It is stipulated and agreed between

8 counsel for the parties that the proof of the authority

9 of the Notary Public before whom this deposition is

10 taken is waived.

11        It is further stipulated that any

12 defects in the Notice are waived.

13        It is further stipulated that the

14 deposition may be signed before any Notary Public.

15

16

17

18

19

20

21

22

23

24

25        * * * * *

5

---

1     (Deposition commenced:  12:15 p.m.)

2

3        CHRISTOPHER WELLS, Deponent,

4 of 40 Walden Avenue, Apt. 1, New London,

5 CT 06320, having been first duly sworn by

6 the Notary Public, was examined and

7 testified, on his oath, as follows:

8

9        DIRECT EXAMINATION

10

11 BY MR. VERDUCCI:

12    Q   Good afternoon, Officer Wells.  Thanks for

13 being here today.  I just want to review quickly, as

14 you know, you are still under oath and understand

15 obviously as a law enforcement officer all that's

16 intended with being under oath, correct?

17    A   Correct.

18    Q   And I just remind you that if I confuse you

19 in any of the questions that I ask, please, rather than

20 answer, point out and give me an opportunity to

21 rephrase so we can move along, okay?

22    A   I understand.

23    Q   Are you under any medication or aware of

24 anything that would adversely affect your ability to

25 recall events accurately today?

---

1    A   Not at all.

2    Q   Great, thanks.  Let me jump back and say my

3 understanding is that between January of 2000 and March

4 of 2001 you worked for a shift commander other than

5 Lieutenant Coleman; is that correct?

6    A   That sounds approximately the right dates,

7 yes.

8    Q   And that you learned in early March 2001 that

9 Lieutenant Coleman was going to become your shift

10 supervisor; is that correct?

11    A   That sounds correct.

12    Q   Let's talk then about prior to your under --

13 prior to March 2001, we will use that as a dividing

14 line, okay?

15    A   I understand.

16    Q   Pre Coleman and post Coleman in terms of

17 knowledge that she was going to become your supervisor,

18 okay.  Prior to the time that you found out she was

19 going to become your supervisor, what shift were you

20 on?

21    A   Over the past 15 years, 16 years I've been on

22 every shift.

23    Q   January 2000 until March 2001.

24    A   January 2000 to 2001 I'm thinking I was on

25 second shift, swing shift.

6

1    Q    And swings began at what time?
2    A    It began at approximately three o'clock,
3  1500.
4    Q    And ran until about what time?
5    A    Eleven, 11:30.
6    Q    During that period of time when you were on
7  swing shift, what shift was Lieutenant Coleman on?
8    A    She was on day shift, I believe, but she may
9  have been in, she may have been in investigation some
10  of that time.
11    Q    Investigation; CID, criminal investigation?
12    A    Correct, criminal investigation.
13    Q    In any case, whether she was the swing shift
14  commander or on CID, fair to say that your contact with
15  her for the most part would be limited between
16  your arrival at three p.m. and her departure an hour or
17  two thereafter?
18    A    You mean when she was on day shift and I was
19  on swing shift?
20    Q    Correct.
21    A    Approximately, other than swing shift having
22  to come in during day shift for training.  We always
23  had a lot of training.  We had a lot of programs we had
24  to attend.  We may have even had some meetings that we
25  had to attend in that time period; again, I don't

Falzarano Court Reporters

7

1  recall the exact dates.
2    Q    During the period of time, what was your
3  position again between January 2000 and March 2001,
4  what was your position within the security department
5  while you were on the swing shift?
6    A    Sergeant.
7    Q    To the best of your recollection then
8  Lieutenant Coleman was either the day shift lieutenant
9  or a lieutenant assigned to the criminal investigation
10  division?
11    A    Correct.
12    Q    So throughout that period of time she did not
13  act as your supervisor?
14    A    Correct.
15    Q    What type of contact did you have with her
16  during that 2000 through March 2001 period?
17    A    Specify.  What do you mean, what type of
18  contact?
19    Q    How often did you see her?
20    A    Daily.
21    Q    Beyond seeing her, how often did you have
22  reason to actually speak with her?
23    A    You are trying to quantify a time; it was,
24  it was constant throughout the day if I was in, which
25  unfortunately everybody has to work overtime, everybody

Falzarano Court Reporters

8

1  has to work for meetings, training that we had to
2  attend.
3    Q    Let me jump back.  When you were on swings,
4  your day normally began, your tour --
5    A    Duty.
6    Q    -- began at three p.m., correct?
7    A    Correct.
8    Q    What time would you arrive at work?
9    A    2:30.
10    Q    How many days on average in a pay period,
11  two-week period would you be required to come to work
12  earlier than 2:30?
13    A    I can't tell you that, I don't know.  I don't
14  recall exactly if this was during the time period that
15  we were having our weekly supervisors' meetings or if
16  this was when we were having the quality control
17  meetings or not.  This was -- I do not recall exactly
18  how much time I had to come in early.
19    Q    You don't recall whether you were having to
20  come in early once or twice a week or every day?
21    A    Well, I don't expect it was every day but it
22  was often when we were doing these meetings; it was
23  quite often because I was one of the ones that was
24  arranging it.
25    Q    What were the meetings that you were coming

Falzarano Court Reporters

9

1  in for?
2    A    We had several different kinds; one was a
3  total quality management set of meetings, again I don't
4  recall exactly what the year was.
5    Q    Is it possible that the TQM meetings occurred
6  prior to 2000?
7    A    It's possible.  I can't tell you.
8    Q    How about what other kinds of meetings were
9  you involved in?
10    A    Oh, the management meetings which were, they
11  wanted all the supervisors to attend and I'm thinking
12  that was either once a week -- but again I'm just
13  taking a guess.  It seems like we were here quite
14  often.
15    Q    Describe for me, if you will, the kind of
16  contact you had with Lieutenant Coleman while you were
17  on swings and she was either on days or CID between
18  January 2000 and March of 2001.
19    A    What kind of contact I had?
20    Q    Yes.
21    A    Business contact.
22    Q    Contact in the broadest possible sense; under
23  what circumstances did you see and talk with her?
24         MR. DeNIGRIS:  Just listen to what he
25         says first.

Falzarano Court Reporters

1    Q   How so?

2    A   As I put there, she put a little more

3 attention, because I was around her a little more

4 often, onto, onto me particularly.

5    Q   About what things was her attention focused?

6    A   Everything.  Everything from the way I cut my

7 hair to the way I shine my shoes; the way I dealt with

8 the troops, to the way I trained the troops, to telling

9 me not to train troops.

10   Q   How long a period of time did Lieutenant

11 Coleman act as your shift supervisor?

12   A   I believe you told me last time it was only

13 six weeks.  I think it was longer than that.

14   Q   I am asking you what's your recollection;

15 about how long?

16   A   Two to three months.

17   Q   Did she have, during the course of that time,

18 did she provide any performance appraisal input on you?

19   A   I don't recall.

20   Q   Did she take any disciplinary action against

21 you?

22   A   Only verbal reprimand, oral admonishments.

23   Q   So nothing in your permanent personnel

24 record?

25   A   I wouldn't know.  I know she, I know a lot of

---

1 the stuff that was in my record got pulled by

2 Lieutenant Cothran and she complained to the chain of

3 command and had them put it all back in my record but I

4 don't know if they actually did that.  If I remember

5 correctly, they didn't actually put it back in there

6 although they said they were going to.

7    Q   During the period of time that Lieutenant

8 Coleman was your shift supervisor, did she issue you

9 any written admonishments, letters of caution, letters

10 of reprimand?

11   A   Not that I'm aware of.

12   Q   These things that were allegedly in your

13 record, taken out of your record, were these written

14 admonishments that she issued?

15   A   Yes.

16   Q   When were they issued?

17   A   Sometime --

18   Q   I am sorry, prior to her becoming your shift

19 supervisor?

20   A   Some of them were.  Some of them were

21 complaints specifically from her to Lieutenant Cothran

22 and her pressuring Lieutenant Cothran to put something

23 in my record, again, like the yellow chair.

24   Q   As a lieutenant on the police force, when she

25 was not your shift supervisor did she have the

---

---

1 authority to issue a letter of reprimand or warning or

2 any other written admonishment?

3   A   A supervisor is still a supervisor regardless

4 of whether she's my direct supervisor or not; we argue

5 that all the time.  I don't think it's been resolved.

6   Q   Captain Anderson, when Mr. Anderson was a

7 captain, would he have had the authority to issue a

8 written reprimand or admonishment to you, to your

9 understanding?  I know --

10   A   It really does change, it depends on how much

11 the supervisor wants to try and push it.  If Captain

12 Anderson had tried to push something where he would get

13 a letter on me, he probably could have.

14   Q   Let me talk about the work environment then.

15 How much is cursing a part of the everyday environment?

16       Between January of 2000 to present, how much

17 is cursing a part of the everyday environment in the

18 security department?

19   A   I would break cursing down into two things:

20 Cursing as in saying the computer screwed up again, or,

21 as I heard today, where the computer ate someone's

22 report, maybe saying that damned computer ate my

23 report, where it's not directed at someone; and then

24 there would be cursing where you are cursing at

25 someone.  Cursing about a nonspecific event or an event

---

1 that is not, it's not your fault, the computer messed

2 up, it's a programming error, whatever.

3    Q   Let me ask first why do you distinguish?

4   A   Because the computer's feelings aren't hurt

5 when you yell at it, the computer.  We're not calling

6 the programmer up and telling him he's an asshole,

7 we're saying the computer screwed up because the

8 computer screwed up, it's a program error, not much we

9 can do about it, or a power outage, like cursing about

10 the weather.

11   Q   What about saying that, you know, that I had

12 a horrible fuckin' flight last night, where does that

13 fit in?

14   A   That, again, it's something I would say is

15 acceptable depending on who's around.  I wouldn't talk

16 that way in front of my kids.

17   Q   Is that type of cursing a regular part of --

18   A   I hear a lot of it.

19   Q   -- the security department?

20   A   I would say -- I say a lot of it.

21   Q   Do you yourself curse in that manner at work?

22   A   Sometimes.  I'm not a big curser.

23   Q   Now what about cursing about someone who's

24 not present, you know, that guy's a bastard, she's a

25 bitch; how much cursing like that goes on about a

---

1  person who's not present?

2  A  Somebody cursing about a person who's not

3  present, I wouldn't say there's very much of that.  I

4  wouldn't say there's much of that.

5  Q  No?

6  A  No.

7  Q  Have you heard other people curse about

8  Lieutenant Coleman in that manner?

9  A  Not really.  I'm a supervisor, they don't

10  talk that way.

11  Q  Have you had people come to you and tell you

12  that Lieutenant Coleman cursed about you in that way?

13  A  Yes.

14  Q  Who's told you that Lieutenant Coleman cursed

15  about you outside your presence?

16  A  Lieutenant Cothran has told me that, Corporal

17  Elphick's told me that, Chief Haas has told me that.  I

18  think Diederichsen probably has told me that sometime

19  or another as well.  Mr. Anderson told me that once.

20  But she didn't wait for it to be out of my presence.

21  Q  Okay.  So the other, I take it the final kind

22  of cursing is cursing at one or about someone in their

23  presence?

24  A  A little more personal.

25  Q  How often does that go on at work?

Falzarano Court Reporters

52

1  a subordinate curse at you in a disrespectful or an

2  insubordinate manner?

3  A  No.

4  Q  Have you ever heard others at work cursing in

5  an insubordinate manner to another sergeant or an

6  officer?

7  A  Yes.

8  Q  Have you ever heard or aware of any of those

9  folks being disciplined?

10  A  Yes.

11  Q  Who have you heard of, who do you know or do

12  you believe has been disciplined for being

13  disrespectful by cursing?

14  A  Sergeant Peake was disciplined for -- I

15  believe it was Sergeant Peake -- no, it was to Sergeant

16  Peake, a guy named Cherubini was, I believe it was him.

17  I think it was Cherubini.

18  Q  Disciplined for being --

19  A  Disciplined for cursing at Sergeant Peake.

20  Q  Anyone else you are aware of was disciplined

21  for cursing at a sergeant or above?

22  A  Yes, Lieutenant Coleman.

23  Q  For cursing at whom?

24  A  I don't know if it was Senior Chief

25  Diederichsen or Chief Haas, it was someone, one of the

Falzarano Court Reporters

1  A  Not very often.  I do take, I do take

2  exception to that, possibly if someone is venting,

3  possibly; not very much.  It's inappropriate so we

4  don't.

5  Q  Have you cursed about someone at work,

6  venting or otherwise?

7  A  No.  I'm not a big curser.

8  Q  Have you heard other people curse about other

9  folks?

10  A  You mean directly at someone, one person

11  cursing someone else out?

12  Q  Heard people cursing about other people, both

13  directly and indirectly, cursing them out or, you know,

14  cursing about someone, venting?

15  A  Not very often, again, because they don't say

16  it in front of a supervisor, not usually.

17  Q  Have you ever taken or recommended

18  disciplinary action against a person on the instances

19  in which you did hear someone cursing about someone

20  else?

21  A  Not that I know of.  Not that I know of.

22  I've told one to take it in an office, you know, if you

23  were going to yell at this person, whatever; whether

24  it's cursing or not cursing, take it in an office.

25  Q  With regard to personally, have you ever had

Falzarano Court Reporters

1  chiefs; not my business, I don't know.

2  Q  Let me move away from cursing for a moment

3  and talk about sex.  How much talk at work is there

4  about sex in regard to sexual conduct, sexual

5  fantasies, sexual relations?

6  A  I would say not very much.  I, again that's

7  not something that's appropriate so if I find somebody

8  talking about sex conduct, behavior, fantasies,

9  whatever, okay, again, go someplace else.  If you want

10  to talk and you two went to conduct yourself, do it

11  privately, don't do it in front of everyone; there's

12  kids, it's inappropriate.

13  Q  Have you heard other folks at work talking

14  about, you know, their sexual conduct or fantasies or

15  talking about, you know, members of the opposite sex in

16  bawdy type language?

17  A  Yes.

18  Q  Have you ever recommended or taken any steps

19  to discipline someone for talking in that manner?

20  A  I don't discipline -- Lieutenant Coleman was

21  the talker, I wasn't the talkee, I just overheard; it's

22  not my business and I couldn't recommend that,

23  anything.

24  Q  Have you heard anyone other than Lieutenant

25  Coleman ever talk about sex or sexual relations or --

Falzarano Court Reporters

Page 55:

```
 1    A    Ever?
 2    Q    -- things like that at work?
 3    A    Possibly.  Possibly.  Ever.
 4    Q    But nothing that comes to mind?
 5    A    No.
 6    Q    On how many occasions did you hear Lieutenant
 7  Coleman talking about sex, you know, sexual relations,
 8  fantasies, things along those lines?
 9    A    Oh, wait a minute, I have another one.  I do
10  know of one other person that, that came up in
11  conversation quite often and he was in trouble for it;
12  he was given a choice, his name was Christy.  This is
13  recent though, not during that time period.
14    Q    Okay, no need to get into the Christy
15  situation then.
16    A    Constantly, again it's the same thing as
17  making a complaint, if I'm talking about a movie or a
18  restaurant or, or a book, Lieutenant Coleman is talking
19  about a nasty joke that she's heard or a comment along
20  the lines of men are only good for one thing or men are
21  only good for two things and trying to get others to
22  agree with her.
23    Q    She initiates all these discussions; is that
24  your --
25    A    Yes.
```

Page 56:

```
 1    A    Well, what I said is it wasn't bawdy.
 2    Q    And then you made that -- well, are you now
 3  saying that the comment, She's got nice legs, is a
 4  sexist comment?
 5    A    It could be.  It could be.  If I remember
 6  correctly under my post training, there are three
 7  different areas of sexist comments going from green to,
 8  I think, yellow and then red.  She's got nice legs
 9  probably isn't a red zone; might be a yellow, might be.
10    Q    Comments like those, how often do you
11  overhear those kinds of comments at work?
12    A    Not often, not that I recognize.
13    Q    Do you make those kinds of comments at work?
14    A    No.
15    Q    Have you ever made those kinds of comments at
16  work?
17    A    Couldn't tell you.
18    Q    Is it possible?
19    A    15 years.
20    Q    Is it possible that others have overheard you
21  talking, describing women and so forth at work?
22    A    Is it possible?  Not likely.  Possible, yes,
23  almost everything is possible.
24    Q    Again I mean the work force in the security
25  department is overwhelmingly male, correct?
```

Page 57:

```
 1    Q    And you never hear men talk about women or
 2  women's body parts or things along those lines at work;
 3  is that your testimony?
 4    A    Oh, no, I do, I have.
 5    Q    Okay, I asked you before about whether you've
 6  heard men talk about sexual matters and so forth and
 7  you said --
 8    A    Bawdy was the key word.
 9    Q    Well, okay.  How is talking about a woman's
10  body parts not bawdy, can you give me an example?
11    A    She's got nice legs.
12    Q    Well, would you believe that that's an
13  inappropriate or a sexist comment?
14    A    Could be, probably.  Could be, depending on
15  the connotation.  Could be.
16    Q    Explain to me how.
17    A    Or, She dresses nice.
18    Q    She's got nice legs, is
19  not -- is ever, at work, an appropriate comment?
20    A    She's lifting or she's running, she's got
21  some serious muscle tone.
22    Q    I didn't ask you that.  I didn't ask
23  commenting on muscle tone.  You said she's got nice
24  legs; how would that comment ever not be inappropriate
25  and sexist?
```

Page 57 (second column):

```
 1    A    High percentage.
 2    Q    What would your best guess be as to what's a
 3  high percentage, is it above 80 percent?
 4    A    I would say probably above 80 percent.
 5    Q    Might it be 90 percent?
 6    A    Is there 20 percent females?  I don't know.
 7    Q    How many people are on your shift at this
 8  moment?
 9    A    Exact numbers, can't tell you.
10    Q    Roughly?
11    A    I am going to say 70.  60, 70.
12    Q    How many women on your shift?
13    A    One, two -- maybe, maybe five to ten.
14    Q    How many off the top of your head can you
15  name?
16    A    Last names?
17    Q    Yes.
18    A    I could probably easily name five.
19    Q    Can you put a face without a name to others
20  beyond those five?
21    A    Possibly.
22    Q    How many can you think of a face without a
23  name beyond those five that you could name?
24    A    A face without a name, anywhere from three or
25  four, somewhere in there.
```

56

57

1    Q    Is that fairly typical of your experience in
2  security department that less than 10 out of 70 on the
3  shift would be female?
4    A    Sometimes more, sometimes less.
5    Q    Let's just talk about civilian females.
6    A    Okay.
7    Q    How many civilian females are you aware of
8  within the security department?
9    A    One, two, three, four, five.  Five or six.
10   Q    So the rest of the females in the security
11 department are military personnel?
12   A    There's quite a few military personnel.
13   Q    Is that five or six civilian females a fairly
14 constant, representative number?
15   A    It fluctuates quite a bit.
16   Q    By how much?
17   A    Again by two or three; but when you are
18 talking five or six people, two or three is quite a bit
19 of percentage.
20   Q    Approximately how many males in the civilian
21 force?
22   A    I am going to guess at 30.
23   Q    What type of language that you would consider
24 lewd have you heard Lieutenant Coleman make?
25   A    Oh, let's see, lewd, cussing every other

Falzarano Court Reporters

60

1  word.
2    Q    I am sorry, sexually lewd?
3    A    Fuck this.  Fuck him.  I try not to be around
4  so. . .
5    Q    Now I'm interested in what you just said.  I
6  asked sexually lewd and you said Fuck this or Fuck him.
7  How do you find the use of fuck in that instance to be
8  sexual?
9    A    Because it's used in a connotation regarding
10 performance.  I'll bet he's a dead fuck sometimes is
11 something that's used.
12   Q    Okay, that's not what you said.  You said
13 Fuck this or Fuck him, and I asked you how you consider
14 that to be sexual.  Don't give me another comment.
15   A    Nothing else, just Fuck him and Fuck that?
16   Q    Yes, how do you consider that to be sexual?
17   A    That's usually where, the point I turn around
18 and leave, so it's just the next couple of comments.
19 Fuck him and Fuck that probably aren't sexual except
20 the him is a male pronoun referring to someone.
21 Whether, whether it's him or a him, I don't know.
22   Q    Have you seen Lieutenant Coleman -- well, let
23 me get back to following up on that.
24        How many times, again sexually bawdy, lewd
25 comments that you've heard from Lieutenant Coleman?

Falzarano Court Reporters

61

1    A    Specifically jokes, comments about marital
2  status; some of it's generalized, You're all a bunch of
3  fucking losers, talking to a group of men.
4    Q    Have you ever seen Lieutenant Coleman chew
5  out a female member of the security department?
6    A    Chew out, I think I've heard some of this,
7  heard some of it as in a rumor, this so-and-so got
8  chewed out, no, I can't say.
9    Q    Again I'm asking you --
10   A    No.
11   Q    -- whether you have seen her yell at, raise
12 her voice to, be demanding of a female employee?
13   A    Not that I can put a name to and say, you
14 know, here, this date, this -- nothing.
15   Q    The kind of comments that you've heard
16 Lieutenant Coleman make that, You're all a bunch of
17 fucking losers and things along those lines, have you
18 ever heard other people in the workplace refer to other
19 people as fucking losers?
20   A    No.
21   Q    Have you heard coworkers curse out other
22 coworkers, You are a fuckin' idiot?
23   A    Oh, no.
24   Q    Never heard anybody else say that?
25   A    No, no, no, no, no, no.  That specifically,

Falzarano Court Reporters

1  no.
2    Q    How about Officer Kujawski, have you heard
3  him curse?
4    A    Yes.
5    Q    Have you heard him curse at people?
6    A    No.
7    Q    About people?
8    A    No.
9    Q    How about Mr. Anderson, have you heard him
10 curse at work?
11   A    No, I don't -- no, he wasn't a big curser
12 either.
13   Q    Who were the big cursers?
14   A    Chief Haas was a big curser, yeah.
15   Q    And who else comes to mind, big cursers?
16   A    Lieutenant Coleman.  Many, many, many years
17 ago, a girl named Callie Carboni.  Think of somebody
18 that curses a lot.
19   Q    How long have you been in the security
20 department, Sergeant Wells?
21   A    16 years or so.
22   Q    Let me ask you how difficult do you think it
23 is for a woman to be assimilated into the security
24 department?
25        MR. DeNIGRIS:  I'm going to object to

Falzarano Court Reporters

1    A    Because it was those kinds of suggestive
2  overtures.
3    Q    Physical or verbal?
4    A    No, it was verbal.  Verbal.  Verbal only.
5    Q    The kind of double entendre things that
6  something can be taken, on its face may be innocent but
7  has an undertone?
8    A    Maybe, yes, word games.
9    Q    Generally did you find her to be, I mean was
10  it that she was a male basher or that there were
11  certain males who she just couldn't seem to stand and
12  went out of her way to be rude and obnoxious to?
13    A    I am going to say some of both.  There were
14  definite, I used to call them targets; if someone was
15  targeted, then they stayed a target for a long time,
16  anything from weeks, day in day out, two, three weeks
17  long to years.
18    Q    Were there people who were targets who, over
19  time, did not, were no longer targets?
20    A    Sometimes.  There were people that she would
21  mess with until, I think until they did what she wanted
22  them to do; and Jim, I think his name is Jim Tabor,
23  same kid I mentioned before, he was a police officer,
24  which is a GS-5 position, and he was promoted to that
25  and she kept after him and kept after him daily, day

1  in, day out, non stop until he took a downgrade,
2  dropped back to a -4 position as a guard and she kind
3  of eased up on him noticeably, and so there was
4  occasions like that.
5        MR. VERDUCCI:  I have no further
6  questions.
7        MR. DeNIGRIS:  I don't have any
8  questions either.
9
10        (Deposition adjourned: 2:17 p.m.)

Falzarano Court Reporters
80



1                STATE OF CONNECTICUT
2      I, DEBORAH A. STEDMAN, a Notary Public, duly
3  commissioned and qualified in and for the State of
4  Connecticut, do hereby certify that pursuant to
5  Agreement there came before me on the 4th day of
6  May, 2004, the following named person, to wit:
7  Christopher Wells, who was by me duly sworn to testify
8  to the truth and nothing but the truth; that he was
9  thereupon carefully examined upon his oath and his
10  examination reduced to writing under my supervision;
11  that this deposition is a true record of the testimony
12  given by the witness.
13      I further certify that I am neither attorney nor
14  counsel for, nor related to, nor employed by any of the
15  parties to the action in which this deposition is
16  taken, and further, that I am not a relative or
17  employee of any attorney or counsel employed by the
18  parties hereto, or financially interested in this
19  action.
20      IN WITNESS THEREOF, I have hereunto set my hand
21  this 24 day of __may__, 2004.
22
23                    _Deborah A. Stedman_
24                    DEBORAH A. STEDMAN
                      LSR #261
25                    Notary Public
My Commission Expires:  September 30, 2007.

Falzarano Court Reporters
81

1                    I N D E X
2  WITNESS                              PAGE
3  Christopher Wells
4    Redirect Examination by Mr. Verducci    4

Falzarano Court Reporters

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ORIGINAL

- - - - - - - - - - x
PETER ANDERSON, et al,
           Plaintiffs,   |   Civil Action No.
                           3:03CV116(MRK)

            vs.        |

GORDON R. ENGLAND, SECRETARY  |
OF THE NAVY,                  November 5, 2003
           Defendant.    |
- - - - - - - - - - x

DEPOSITION OF PHILIP KUJAWSKI

Taken before Deborah Stedman, LSR #261, a
Court Reporter and Notary Public, within
and for the State of Connecticut,
pursuant to Notice and the Federal Rules
of Civil Procedure, at the Naval Submarine
Base New London, Groton, Connecticut, on
November 5, 2003, commencing at 3:40 p.m.

FALZARANO COURT REPORTERS
117 N. Saddle Ridge
West Simsbury, CT  06092
860.651.0258

EXHIBIT D-1

```
1        A    I was hired as a police officer, yes, I was.
2        Q    Where did you begin working?
3        A    In the armory.
4        Q    Immediately?
5        A    I was approached by the physical security
6    people, they had failed a couple of safety inspections,
7    numerous ones actually, and I was asked because I have
8    knowledge of weapons if I would be interested in
9    helping them getting it fixed.
10       Q    Who approached you?
11       A    Kathy Wojciechowski, who was a physical
12   security officer.
13       Q    Was she in charge of the armory at that time?
14       A    Yes, she was.
15       Q    Were you approached the first day you began
16   in January of 2000 or did you work -- let me finish the
17   question -- did you work as a police officer, have some
18   of those duties prior to going to the armory?
19       A    No, I did not.
20       Q    So you immediately went to the armory?
21       A    Yes, I did, after phase one training.
22       Q    How long was training?
23       A    Three weeks almost.
24       Q    Was that completed by the end of January?
25       A    February.
```

Falzarano Court Reporters

8

```
1        Q    Was the phase one training for police officer
2    duties?
3        A    Yes, it was.
4        Q    So after you completed the training as a
5    police officer you went to work in the armory?
6        A    Correct.
7        Q    What did you do there?
8        A    From the beginning, there was no paperwork,
9    no sort of records kept, no inventory, no maintenance
10   was done on any of the firearms that was in there.
11   There was 300 .9 millimeter handguns, there was 84
12   shotguns and 30 M-16 machine guns that were totally not
13   accounted for, there was no records; there was no
14   preventive maintenance done on the weapons for quite
15   some time.
16       Q    So did you take care of all that while you
17   were there?
18       A    I certainly did.  Yes, I did.
19       Q    How long did you work in the armory?
20       A    I worked in the armory full time for one year
21   and then half the time I would work in the armory and
22   the other half of the time I was working in the
23   training department.
24       Q    During the first full year that you were
25   working in the armory, what hours were you working?
```

Falzarano Court Reporters

9

```
1        A    I was mostly working day shift.
2        Q    Is that --
3        A    From seven to 3:30 but I was usually there
4    until four or five o'clock most days, some days more
5    because there was a lot of work to do.
6        Q    So were you working overtime?
7        A    Yes.
8        Q    Did you get paid overtime for working
9    overtime?
10       A    Yes, I did.
11       Q    Was your salary or your pay the same in the
12   armory as it would have been had you been working
13   police officer duties?
14       A    Yes.
15       Q    So you were still in that position, you were
16   just assigned different duties?
17       A    I was still listed as an 083 police officer
18   but I was assigned to the armory.
19       Q    What was your GS level?
20       A    -5.
21       Q    Did you have any contact with Lieutenant
22   Coleman during your time in the armory?
23       A    Yes.
24       Q    How often?
25       A    Direct contact with her, at least once a day
```

Falzarano Court Reporters

```
1    during the workday.
2        Q    Did you understand what her position was at
3    that time?
4        A    Well, before I graduated phase one, I wasn't
5    quite sure what her position was.  I knew she was a
6    lieutenant.
7        Q    A lieutenant police officer?
8        A    Yes, and I was under the impression that she
9    was my direct supervisor.
10       Q    Why were you under that --
11       A    Because she told me that I would do what she
12   said when she said to do it.
13       Q    When did she tell you that?
14       A    About a week before graduation from phase one
15   when she pulled me out of the classroom.
16       Q    Where did the training take place?
17       A    At building 462 in the classroom.
18       Q    It was an all-day training?
19       A    Yes.
20       Q    Every day?
21       A    Every day Monday through Friday.
22       Q    7:00 a.m. to 3:30 p.m.?
23       A    Some days it went until five.  We had gun
24   shoots that went into the nighttime.
25       Q    Was Lieutenant Coleman involved in the
```

Falzarano Court Reporters

1    Q    What did he tell you?
2    A    No, she could not because that's what I was
3  hired as.
4    Q    And do you know whether Lieutenant Coleman
5  made those comments, made similar comments to anyone
6  else in the training class?
7    A    At that point, no, I do not know.
8    Q    Do you know whether she just left and went
9  back to where she came from?  Did you see where she
10  went to?
11    A    No, I did not.
12    Q    Now, your rank is -- you are an officer?
13    A    Yes.
14    Q    And Lieutenant Coleman is a lieutenant?
15    A    Correct.
16    Q    Has she ever supervised you while you've
17  worked on the naval base?
18    A    Directly, no.
19    Q    So is it fair to say that she doesn't have
20  authority to give you orders, make reprimands
21  concerning you?
22    A    Today I know that.
23    Q    You filed a complaint through your colleagues
24  in January 2003 alleging discrimination based on age
25  and gender.  What events form the basis of your

Falzarano Court Reporters

16

1  allegations?
2    A    For gender?
3    Q    Sex.
4    A    She -- the smoking section for the department
5  is north side of the building, there's a little -- we
6  call it the smoke tree; there is an area that's
7  designated for smoking.  You are not allowed to walk
8  anywhere and just have a cigarette outside, you have to
9  go to that area and I am a smoker and Lieutenant
10  Coleman is a smoker and I was out there one day and was
11  just, I just started working in the armory and this is
12  where it began, I guess, and she asked me if I was
13  married; and I said yes, I was; and she asked me if I
14  had cheated on my wife yet.
15    Q    And what did you say?
16    A    And I -- no.  Well, you all fuckin' do, and
17  she looked down at my crotch.
18    Q    And when was this?
19    A    This was shortly after I had started working
20  in the armory.
21    Q    So it would have been February 2000?
22    A    I was going to say probably March.
23    Q    How do you know that she was looking at your
24  crotch?
25    A    She looked straight down at it; there was no

Falzarano Court Reporters

17

1  doubt where she was looking.
2    Q    For how long?
3    A    I turned and walked away.
4    Q    Did you say anything to her?
5    A    No, ma'am.
6    Q    Why not?
7    A    I was scared to, at that point.
8    Q    Did you tell anyone else about it?
9    A    Yes, I did.
10    Q    Who did you tell?
11    A    I went to Kathy Wojciechowski.
12    Q    And what did she do?
13    A    I asked her -- I told Kathy that I was to the
14  point where I was afraid to go out and get air, I was
15  afraid to go out and have a cigarette, that I didn't
16  know how I was supposed to handle it so I asked Kathy
17  what I had to do to get her to stay away from me.
18    Q    What did she tell you?
19    A    Kathy went -- we were up in Kathy's office on
20  the second floor of the building and she went directly
21  across the hall to Mr. Sheridan's office and told him
22  what had occurred.
23    Q    I am sorry?
24    A    She explained to Mr. Sheridan what I told her
25  what had just occurred outside and Mr. Sheridan said he

Falzarano Court Reporters

1  would handle it.
2    Q    And did you ever follow up on whether
3  anything was done about it?
4    A    I asked Kathy and she said Mr. Sheridan said
5  nothing had been done or not done.  I had no idea what
6  was done or not done.
7    Q    Did you continue to follow up with Kathy?
8    A    Kathy wasn't being -- was just being told it
9  was being handled and after that nobody knew anything.
10    Q    When you were working in the armory and this
11  incident occurred, how often did you see Lieutenant
12  Coleman at that time?
13    A    Four or five times a day.  She was on days.
14    Q    She was on day shift?
15    A    Yes.
16    Q    For how long at a time?
17    A    I'd come out of the armory, go down the hall
18  to drop off paperwork or go out to the smoking tree or
19  into the booking room to pick something up off the
20  printer and I'd see her.
21    Q    And did she ever make any more comments to
22  you?
23    A    Yes, she did.
24    Q    What did she do?
25    A    She asked me some legal questions.  She'd ask

Falzarano Court Reporters

1  -- this happened multiple times.  She'd ask me some
2  very legal questions, they were legally worded
3  questions and asked me to explain what they meant and
4  when I said I am not a lawyer, I can't explain them,
5  she said I was a fucking loser that nobody else wanted.
6      Q    Did she make any more comments about your
7  marriage?
8      A    At that point, no.
9      Q    How old were you in January of 2000?
10          What's your date of birth?
11     A    7/1/61.  I am 42 years old now.
12     Q    But in January 2000?
13     A    38, 39 years old.
14     Q    38, 39.  In your complaint or at least -- you
15  filed an administrative complaint as part of this
16  process, right?  Do you remember filing an EEO
17  complaint?
18     A    Yes.
19     Q    Let me show you what's -- give me just a
20  minute.  Let me just cover another area first.
21          At some point you stopped working in the
22  armory, right?
23     A    Yes.
24     Q    And you went back to your police officer
25  duties?

Falzarano Court Reporters

20

1      A    Yes.
2      Q    And that's where you are today?
3      A    Yes.
4      Q    When did that change occur?
5      A    Almost two years ago.
6      Q    Do you know about what month?
7      A    November.  It was November 2002.
8      Q    2001?
9      A    Two.
10     Q    2002?
11     A    Yes.  No, it was 2001, I am sorry.
12     Q    So that would have been almost two years
13  since you -- you worked in the armory for almost two
14  years; is that correct?
15     A    I worked in, in the armory full time for one
16  year, part time in the armory and part time in the
17  training department.  I was sent to be a law
18  enforcement firearms instructor.
19     Q    Do you still do that today --
20     A    Yes, I do.
21     Q    -- as part of your duties?
22     A    Yes, I do.
23     Q    So you do firearms training?
24     A    Yes, ma'am.
25     Q    Is that half time or --

Falzarano Court Reporters

21

1      A    I do that when it's required.
2      Q    How often do you do that?
3      A    Once a month on the average.
4      Q    I do want to show you, this is the report of
5  investigation regarding your EEO complaint that was
6  filed.  Does this look familiar to you?
7      A    Yes.
8      Q    Did you get a copy of this report as part of
9  the process?
10     A    I may have.  If I have it, I am not sure
11  where it is.
12     Q    Just turning to page 2 of the attachments to
13  the report, this appears to be Complaint of
14  Discrimination, the Department of the Navy, with your
15  name on it.  Did you fill this out?
16     A    Yes, it's my writing.
17     Q    This is your signature?
18     A    Yes, it is.
19     Q    And dated February 2nd, 2001, is it?
20     A    It's 21 December '01.
21     Q    Oh, 21 December '01, okay, I am reading
22  upside down.  I see that you checked the box with the
23  basis of your discrimination claim is based on sex and
24  age and reprisal; is that correct?
25     A    I -- I don't remember checking out the boxes;

Falzarano Court Reporters

1  that was a long time ago.  I am not --
2      Q    Did someone help you prepare this?
3      A    There was an EEO counselor there with me.
4      Q    There's a statement attached to the EEO
5  complaint starting on page 3.  Do you recognize this
6  document?
7      A    Yes, I do.
8      Q    Did you prepare this?
9      A    Yes, I did.
10     Q    On a computer or --
11     A    Yes.
12     Q    In the statement just if you want a minute to
13  review it, I will give you a minute, I believe you say
14  that the basis of your complaints are white male over
15  40 and whistleblower, but you cite harassment by
16  Lieutenant Coleman while you were in the armory and
17  then your replacement in the armory with somebody else;
18  is that correct?
19     A    At that point, yes.
20     Q    And I think there's another exhibit to this.
21  Just looking at page 23, does that appear to be the
22  intake complaint when you interviewed with the EEO
23  officer?  Did you fill this out, page 23?
24     A    No, I did not.  That is not my writing.
25     Q    Do you remember sitting down with an EEO

Falzarano Court Reporters

31

```
1   that?
2       A    Heard her, no.
3       Q    Heard anybody?
4       A    No.
5       Q    Has anyone ever told you since you started
6   working on the naval base anything negative about
7   Lieutenant Coleman?
8       A    No.
9       Q    Nothing?
10      A    Nothing other than that she was harsh.
11      Q    I am sorry?
12      A    Harsh.
13      Q    That she's harsh?
14      A    Harsh.
15      Q    Sort of abrasive?
16      A    Yeah.
17      Q    And since you've been working on the base
18  what is your knowledge of the, I guess, use of foul
19  language among your colleagues in the security force?
20      A    You mean --
21      Q    Does anyone cuss during the course of their
22  duties?
23      A    Swear?
24      Q    Yes.
25      A    Yeah, yes.
```

Falzarano Court Reporters

```
1       Q    Do they cuss at each other?
2       A    No.
3       Q    Just --
4       A    Most of the time, it's something, if
5   something surprising occurred.  They would not, without
6   thinking, say, like, Oh, shit, something like that.
7            MS. PERKINS:  Just give me a minute.
8
9            (Pause in questioning.)
10
11           MS. PERKINS:  Can we just take a
12       short break?
13           MR. De NIGRIS:  Sure, you can.
14
15           (Recess:  4:27 to 4:33 p.m.)
16
17           MS. PERKINS:  I just have a couple
18       more questions for you, Officer Kujawski.
19  BY MS. PERKINS:
20      Q    Earlier you testified that when you were in
21  the armory you had contact with Lieutenant Coleman,
22  about four or five times a day, you saw her.  Could you
23  just quantify for us in about how many minutes a
24  day do you think you saw her?
25      A    That varied.  Some days, five minutes.  Other
```

Falzarano Court Reporters

33

```
1   days, as part of being in the armory, I was also
2   responsible for arming the second shift and the first
3   shift, downloading first shift, which means that when
4   second shift comes in, I would issue their weapons.
5       Q    Okay.
6       A    And when first shift came in and turned in, I
7   would put their weapons away and do paperwork and I
8   would see Lieutenant Coleman pretty much 20, 25 minutes
9   that it took to do that.
10      Q    So did she turn in her weapon as well?
11      A    Correct.
12      Q    And you issued her weapon when she came on
13  shift?
14      A    Yes, I did.
15      Q    Would you say that you saw her less than 30
16  minutes a day on average when you were in the armory
17  for a total time, an average, or less than; 15 minutes,
18  some days you --
19      A    30, 35 minutes a day total.
20      Q    At most?
21      A    That was average.
22      Q    You testified also about these two incidents
23  where, when you were in the armory and you had just
24  gotten done with training that she came up to you
25  during a smoke break and made some comment about how
```

Falzarano Court Reporters

```
1   you would cheat on your wife because all men do and
2   looked down at your crotch and then later on she asked
3   you some legal question, and, because you couldn't
4   answer it, she called you stupid.  Are there any other
5   times?
6       A    She didn't call me stupid, ma'am.
7       Q    I am sorry, what did she --
8       A    She did not call me stupid.
9       Q    What did she say?
10      A    She called me a fuckin' idiot that nobody
11  else wanted.
12      Q    I didn't remember your testimony.  I didn't
13  mean to mischaracterize it as stupid.  But in any
14  event, other than those two instances that you can
15  remember, are there any other times that she made any
16  derogatory comments to you?
17      A    Yes.
18      Q    Okay.  Can you tell me when and what the
19  comment was?
20      A    In what time frame would you like?
21      Q    Well, let's start when you were in the
22  armory.
23      A    When I was in the armory her legal question
24  thing would come up at least twice a week and she used
25  to ask me questions like an attorney.  The only way I
```

Falzarano Court Reporters

1 can describe it, it was like reading a will the way she
2 was talking to me.
3    Q    And how would she approach you with these
4 questions, would you be smoking or --
5    A    Yes.  I was petrified to go smoke.  I think
6 on the average I used to smoke a pack a day and when I
7 was working in the armory I think I cut down to a
8 quarter of a pack to a half a pack a day because I was
9 petrified to go to the smoke pit.
10    Q    Because she might ask you some legal
11 question?
12    A    I was sick of the confrontations at that
13 point.
14    Q    Did you continue to go smoke at the smoke
15 tree and encounter her?
16    A    I continued to go smoke at the smoke tree and
17 I used to, the only way I can describe it is it was
18 avoidance.  I'd go out, I'd look, see if she was there;
19 if she wasn't, run out and I'd smoke a cigarette and
20 I'd run back in.
21    Q    Okay, but you said during your time in the
22 armory about --
23    A    I'd always get caught sooner or later.
24    Q    -- about two times a week you'd see her.
25 What would you say to her after she made some comments

Falzarano Court Reporters

36

1 like that to you?
2    A    I told the lieutenant, I finally got to the
3 point where I told the lieutenant that I am not an
4 attorney, I've never been to law school, I can't answer
5 your questions.
6    Q    Did you ever tell anyone else about these
7 particular types of incidents?
8    A    Yes.
9    Q    Who?
10    A    Mr. Sheridan.  I went to my direct chain,
11 chain of command and I went to Mr. Sheridan with it.
12    Q    And your direct chain of command at that time
13 was Kathy Wojciechowski?
14    A    Kathy Wojciechowski.
15    Q    And Mike Sheridan?
16    A    And Kathy answered to Mr. Sheridan and
17 Commander Stafford.
18    Q    I am sorry, did you directly take the
19 complaint to Mr. Sheridan?
20    A    I typed it up on the computer, put it in
21 writing and signed it and did not want to jump -- we
22 were always told that we could not jump the chain of
23 command.  We had to use our chain of command first.
24    Q    Was this just a memo or a statement?
25    A    It was a typed up letter.  It was a typed up

Falzarano Court Reporters

37

1 complaint off the computer.
2    Q    Just like a --
3    A    A word.
4    Q    One paragraph or was it a page?
5    A    Page.
6    Q    When did you make this complaint?
7    A    I made numerous complaints, ma'am, since
8 then.
9    Q    Well, let's just talk about this first one.
10    A    The first one went to Mr. Sheridan's desk;
11 again I was informed by Mr. Sheridan that it would be
12 taken care of.
13    Q    Did you give it directly to him or did you
14 give it to Kathy?
15    A    I gave it to Kathy.
16    Q    And you understood that she gave it to him?
17    A    I watched Kathy give it to him.  I was not
18 just working in the armory, I was doing my -- a lot of
19 my armory paperwork was done in the physical security
20 office on the second floor of the building which was
21 directly across from Mr. Sheridan's office.
22    Q    And did you ever make any other complaints?
23 Did she, did Lieutenant Coleman -- strike that.
24    Did Lieutenant Coleman ever make any other
25 comments to you regarding the whole legal question,

Falzarano Court Reporters

1 kind of badgering you about your not knowing the answer
2 to some legal question that you complained about?
3    A    Lieutenant Coleman came up to me after I put
4 my second written complaint in to Mr. Sheridan and told
5 me there was no fucking way I was going to get her,
6 quote.
7    Q    Did you understand from that statement that
8 somebody had actually talked to her about it?
9    A    At that point I was sure of it.
10    Q    And regarding going back to your last
11 statement that you made numerous complaints, how many
12 complaints in writing did you make that you understood
13 went to Mike Sheridan about Lieutenant Coleman's
14 behavior?
15    A    I'm not sure of the exact number, but dozens.
16    Q    Do you have copies of them?
17    A    They were done on the computers at work.
18    Q    Did you save them?
19    A    They are gone.  Everything I had saved on my
20 H drive and everything I had saved in my briefcase with
21 my user name on the computer miraculously disappeared.
22    Q    When did it disappear?
23    A    Everything I had in there disappeared about
24 nine months ago.  They said they were doing computer
25 maintenance and that a lot of things may have been

Falzarano Court Reporters

1  Q   So after that?

2  A   Yup.  It was probably June, July, somewhere

3  in that time frame.

4          MS. PERKINS:  I don't have any other

5  questions.

6          MR. De NIGRIS:  I don't have any

7  questions.

8          MS. PERKINS:  We will just note that

9  we are going to continue this at a later date

10  if necessary.

11

12          (Deposition adjourned:  4:52 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

---

1          STATE OF CONNECTICUT

2       I, DEBORAH A. STEDMAN, a Notary Public, duly

3  commissioned and qualified in and for the State of

4  Connecticut, do hereby certify that pursuant to

5  Agreement there came before me on the 5th day of

6  November, 2003, the following named person, to wit:

7  Philip Kujawski, who was by me duly sworn to testify to

8  the truth and nothing but the truth; that he was

9  thereupon carefully examined upon his oath and his

10  examination reduced to writing under my supervision;

11  that this deposition is a true record of the testimony

12  given by the witness.

13       I further certify that I am neither attorney nor

14  counsel for, nor related to, nor employed by any of the

15  parties to the action in which this deposition is

16  taken, and further, that I am not a relative or

17  employee of any attorney or counsel employed by the

18  parties hereto, or financially interested in this

19  action.

20       IN WITNESS THEREOF, I have hereunto set my hand

21  this 20th day of November, 2003.

22

23                    Deborah A. Stedman
                      LSR #261
24                    Notary Public
25

My Commission Expires:  September 30, 2007.

Falzarano Court Reporters

48

1              I N D E X

2  WITNESS                      PAGE

3  Philip Kujawski

4      Direct Examination by Mr. Verducci    4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Falzarano Court Reporters

Falzarano Court Reporters

ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - x
PETER ANDERSON, et al,
           Plaintiffs,   |   Civil Action No.
                          3:03CV116(MRK)

          vs.         |

GORDON R. ENGLAND, SECRETARY |
OF THE NAVY,             May 4, 2004
          Defendant.   |
- - - - - - - - - - x


DEPOSITION OF PHILIP KUJAWSKI
Volume 2


     Taken before Deborah Stedman, LSR #261, a
Court Reporter and Notary Public, within
and for the State of Connecticut,
pursuant to Notice and the Federal Rules
of Civil Procedure, at the Naval Submarine
Base, Groton, Connecticut, on May 4, 2004,
commencing at 2:30 p.m.


FALZARANO COURT REPORTERS
117 N. Saddle Ridge
West Simsbury, CT   06092
860.651.0258

EXHIBIT D-2

1    Q    What kind of contact did you have with her on
2  a daily business basis?
3    A    In the beginning?
4    Q    Yes, again right now I am just going to focus
5  February 2000 through November 2001.
6    A    It would be usually at the smoking tree at
7  the north side of building 462.
8    Q    How many times on a normal -- well, your
9  normal work hours were what during that period of time?
10    A    That varied.  I usually came in by seven
11  o'clock in the morning and I usually left by four
12  o'clock in the afternoon, sometimes later because I was
13  also doing training duties with Captain Anderson, and
14  there was times where we were there until ten o'clock
15  at night.
16    Q    How often did you take smoke breaks?
17    A    In the beginning I used to go out maybe once
18  an hour.
19    Q    Did that change during the February through
20  November 2001 period?
21    A    Yes, it did.
22    Q    How did the frequency of your smoke breaks
23  change?
24    A    I used to go out every couple of hours, two,
25  three hours, if I could.

Falzarano Court Reporters

8

1    Q    Why did the frequency diminish?
2    A    Because of my constant attacks from
3  Lieutenant Coleman.
4    Q    When you were going out once an hour, how
5  often was she out there?
6    A    She was probably almost every time I went out
7  there but that varied, depending on what was happening.
8    Q    What do you mean, depending on what was
9  happening?
10    A    Depending how busy the shift was, depending
11  what was going on.
12    Q    Were there other folks at work who you would
13  typically see at the smoke tree during those breaks?
14    A    Yes.
15    Q    Besides Lieutenant Coleman?
16    A    Yes.
17    Q    Can you give me the names of some of the
18  folks who you'd see out there?
19    A    Specifically at smoke -- there was a lot of
20  people in the department that smoked.  It would be
21  myself, Lieutenant Coleman, officer Ken Miller.
22    God, who was here then?  There was -- I can't
23  remember specifically individuals; I mean a lot of them
24  aren't here anymore.  I used to go out there a lot with
25  Ken Miller.

Falzarano Court Reporters

9

1    Q    Now in the times that you were out there
2  where Lieutenant Coleman made comments to you about
3  cheating on your wife and things along those lines, did
4  Ken Miller hear those?
5    A    No, he did not.
6    Q    Can you tell me why he didn't?
7    A    Only thing I can tell you is that she only
8  did her attacks against me normally when nobody was
9  around.
10    Q    Let me talk to you a little bit about the
11  working in the security department.  Give me an idea
12  cursing, in general, how often did you hear cursing at
13  work?
14    A    General cursing, swearing, probably daily.
15    Q    Probably daily or --
16    A    Daily.
17    Q    I mean is it fair to say that people curse
18  freely in conversation, talking about things?
19    A    Pretty much, yes.
20    Q    How about talk about sexual activity, you
21  know, how often do you hear that at work?
22    A    Not very often.
23    Q    Do you hear people, you know -- first off,
24  the environment that you work in is overwhelmingly
25  male; is that a fair statement?

Falzarano Court Reporters

1    A    That would be untrue at this time.
2    Q    Untrue at this time?
3    A    Yes.
4    Q    Between February of 2000 and November of 2001
5  when you were working in the armory, obviously you were
6  working with Kathy on a regular basis, right?
7    A    Yes.
8    Q    How many men were involved in the armory
9  operation?
10    A    There was, after Ken Miller left the armory,
11  he was activated to Kosovo, it was just me and Kathy.
12    Q    The majority of your work day included close
13  contact with her?
14    A    Yes, it did.
15    Q    Aside from Kathy your duties required you to
16  check out weapons and ammunition and receive weapons
17  and ammunition from members of the security department?
18    A    Yes.
19    Q    Those contacts were rather short in duration;
20  is that --
21    A    Unless I was doing training, yes.
22    Q    Was there sexual banter in the workplace at
23  all, men, you know, talking, describing women or
24  talking about things along those lines?
25    A    Not -- no.

Falzarano Court Reporters

1  enough flexibility in the system to accommodate those
2  kinds of requests?
3      A    If it was done in a timely manner and it
4  wasn't going to interfere with the people who were
5  scheduled, because that means that their qualifications
6  were due to expire, but if that individual's quals were
7  due to expire within a week, ten days, two weeks, yes,
8  we used to let them, if we had the extra ammo; it
9  wasn't a big deal.
10     Q    Ultimately was that decision one that the RSO
11 had the authority to make?
12     A    Yes, it was.
13     Q    Besides Captain Anderson, to whom did you
14 complain about Lieutenant Coleman?
15     A    In the beginning, it would have been my
16 direct supervisor Kathy Wojciechowski.
17     Q    Who else besides Kathy?
18     A    I used to go to Kathy because we were not
19 allowed to go outside the chain of command.
20     Q    Then I understand later on obviously you were
21 working for Captain Anderson and you spoke to him about
22 these instances as well as Kathy; is that correct?
23     A    Yes, I did.
24     Q    Then did things change at all after you,
25 after November of 2001 when you went on patrol duties?

Falzarano Court Reporters

20

1      Q    Aside from seeing her, what kind of contact
2  you know, talk, that type of thing, did you have with
3  her?
4      A    Normally when I was out at the smoke tree.
5      Q    How many times a day did that occur while you
6  were on patrol duty?
7      A    It varied.  I saw her daily at least once,
8  some days more because I was there later because, as
9  well as my patrol duties, I used to assist the training
10 department still when they had gun shoots which went
11 into night.
12     Q    Tell me the nature of the comments that
13 Lieutenant Coleman made to you.
14     A    She used to, at first used to ask me about my
15 marriage and ask me if I had cheated on my wife yet,
16 and then this used to occur regularly and I used to say
17 no and she'd say you -- "You will, all men fucking do,"
18 quote.
19     Q    That was initially, you said.  Now did those
20 comments persist through the present?
21     A    Yes, pretty much.
22     Q    When is the last time she's made a comment to
23 you about asking you whether you cheated on your wife
24 and telling you that you will?
25     A    I can't recall the last time because her

Falzarano Court Reporters

1      A    No, they did not.  Excuse me, just clarify.
2      Q    Go ahead.
3      A    Did they change, my relationship with
4  Lieutenant Coleman change?
5      Q    Did you still -- well, that's a good
6  question.  Let me break it down piecemeal.
7           Did the frequency with which you saw
8  Lieutenant Coleman change after November of 2001 when
9  you went on patrol duties?
10     A    If I'm not mistaken, Lieutenant Coleman was
11 moved to second shift at that time.
12     Q    That would have been the shift that went from
13 middle of the afternoon until 2300 at night, from about
14 three in the afternoon until 2300 at night?
15     A    3:30 to 11:30.
16     Q    I mean does that mean that since you were
17 working on days you weren't seeing much of her?
18     A    I would see her daily.
19     Q    But how much time from November of 2001 on?
20     A    I used to be what they called a ready issue
21 person.  They had people that were to issue weapons to
22 the oncoming shift and take in the weapons from the
23 off-going shift.  I used to see Lieutenant Coleman for
24 that whole time because she used to hold her roll call
25 right outside of our ready issue room.

Falzarano Court Reporters

21

1  attacks were so frequent and so constant.
2      Q    This week?
3      A    No, not this week.
4      Q    This month?  I realize it's only the fifth.
5      A    Yeah, not this month.
6      Q    This year?
7      A    Yes, this year.
8      Q    Before or after spring began?
9      A    It was before spring, I was in the winter.
10     Q    So it's been a couple of months since you can
11 recall this occurring?
12     A    Since I can recall yes.
13     Q    Who was present when it last occurred?
14     A    Nobody.
15     Q    Where did it occur?
16     A    It was outside.
17     Q    Where outside?
18     A    Parking lot of building 462.
19     Q    How did this come up?
20     A    I was smoking a cigarette at my vehicle,
21 which is, officially it's not allowed unless you are
22 smoking in the designated smoking area but the
23 instruction states you can smoke in your vehicle and at
24 your vehicle and I was at my vehicle and she walked
25 over to complain about me smoking in the parking lot.

Falzarano Court Reporters

1    Q    Okay, and --

2    A    And the question was brought up again.

3    Q    So she shows up and does the first thing she

4    do, is the first thing that she says something about

5    your smoking?

6    A    That was the first thing she said.

7    Q    What did she say?

8    A    She said, What are you doing smoking out

9    here?  You are supposed to be smoking over there.

10    Q    How did you respond?

11    A    I said I was told, the instruction states you

12    can smoke in your vehicle and at your vehicle.

13    Q    She probably pointed out that you weren't in

14    your vehicle?

15    A    She pointed that out very clearly, sir.

16    Q    Tell me what happened next.

17    A    So you still married?  Getting divorced yet?

18    Cheat on your wife yet?  You will; you all do.

19    Q    Now prior to that incident, how much time had

20    passed since she asked you that question?

21    A    I can't recall.

22    Q    I mean --

23    A    I mean her attacks were so frequent I got to

24    the point where I was just used to them and I tried to

25    avoid her at all costs.

Falzarano Court Reporters

24

1    Q    How long a period of time were you assigned

2    to a shift that she was responsible for?

3    A    We were on lock down for, I'm going to guess,

4    a month and-a-half.  We were working 12 to -- I was

5    working 12 to 18-hour shifts with Captain Anderson

6    because we had training of the new personnel for the

7    security force that was required and I was also on

8    patrol.

9    Q    So this was before or after November of 2001?

10    A    This was after.  It was 9/11, after 9/11.

11    Q    Right, that's why I am thinking, September

12    11th, we all understand and it was two months later

13    that you were reassigned off of or out of training in

14    the armory onto patrol duties, right?

15    A    Correct, but we were working patrol.  After

16    that, everybody was on the road.

17    Q    What other comments did Lieutenant Coleman

18    make to you, what kinds of comments?

19    A    Usually her comments, if they weren't calling

20    me a fucking loser that nobody else wanted or asking me

21    about cheating on my wife, it was normally belittling

22    me is the only way I can describe it, put me down in

23    front of others.

24    Q    Anything else?

25    A    Her attacks on me were so frequent, sir, I --

Falzarano Court Reporters

1    Q    What questions or comments has she made to

2    you regarding -- beyond that that you found to be

3    offensive or inappropriate?

4    A    Back when it all, in the earlier days

5    Lieutenant Coleman used to make it perfectly clear that

6    she had a, quote, fucking Master's degree and she

7    should be teaching and could work at any police

8    department she wished.  So she used to always ask legal

9    questions to me and they weren't police questions, they

10    were lawyer type of questions, that's the only way I

11    can describe them to you and used to ask me what that

12    meant.

13    Well, if I couldn't answer that question,

14    Just a fucking man, another loser, nobody else wanted

15    so you came here.  What am I supposed to do with you?

16    Q    You were not working for her at that time,

17    correct?

18    A    That is correct.

19    Q    Have you ever been assigned to her shift?

20    A    Full time, no.

21    Q    What's the longest period of time in which

22    you were assigned to a shift that she was responsible

23    for supervising?

24    A    The longest period of time was during our --

25    after 9/11, the World Trade Center.

Falzarano Court Reporters

25

1    it, just a lot of the time, it was, it was just

2    something I took and I -- she used to ask me, again, it

3    was a whole bunch of legal questions; she used to word

4    them very legally and I didn't understand what she was

5    trying to get out of me, and I was a fucking idiot.

6    Q    She never propositioned you or gave you any

7    invitation or indication that she wanted to be

8    personally involved with you, did she?

9    A    No.

10    Q    Did you ever see her act in a manner with

11    another member of the security department that you

12    thought was sexually suggestive?

13    A    I never witnessed anything like that.

14    Q    Have you witnessed her chewing out other

15    people?

16    A    Yes, I have.

17    Q    Males?

18    A    Males.

19    Q    Have you ever seen her chewing out a female?

20    A    I have never witnessed her chewing out a

21    female.

22    Q    I mean any, have you heard complaints within

23    the workplace that indicate that she treats, that she

24    gives women preferential treatment on her shift?

25    A    Hearsay.

Falzarano Court Reporters

31

```
 1    Q    And having a conversation with Lieutenant
 2 Coleman?
 3    A    Yes.
 4    Q    She wasn't rude or cursing at you in the
 5 course of that phone call, was she?
 6    A    No, she was upset because her requal list was
 7 not good.
 8    Q    Although she was upset, she was not rude nor
 9 cursing at you, was she?
10    A    No.
11    Q    Now you reported to officials within the
12 security department that she was rude and cursing at
13 you, weren't you?
14    A    That she was upset that her requal list was
15 no good.
16    Q    Did you tell the officials that she was rude
17 and cursing at you?
18    A    I don't recall exactly what I told them.  I
19 told them that she was upset because her requal list
20 was not up-to-date, she was unable to contact all her
21 people; and then they asked me if she was coming in,
22 and I said I have no idea.
23    Q    So did you tell Chief Lindsley that
24 Lieutenant Coleman blatantly refused to come in?
25    A    I don't recall telling him that.
```

Falzarano Court Reporters

```
 1    Q    Can you offer any explanation as to why he
 2 would have recalled that that's what you told him?
 3    A    No.
 4    Q    That's a big deal on a requal, isn't it, for
 5 someone to blatantly refuse to come in?
 6    A    Yes, it is, sir.
 7    Q    Now have you ever been formally or informally
 8 reprimanded or admonished for cursing at work?
 9    A    Not to my knowledge.
10    Q    Has anybody ever pointed out to you that you
11 curse too much at work?
12    A    Detective Escalet.
13    Q    Anybody else?
14    A    Maybe.  I don't recall.
15    Q    Do you think that your cursing at work
16 differs, you know, more than, less than, about equal to
17 what you normally hear at work?
18    A    Yeah, I think it's no more, no less.
19    Q    Your supervisors, have any of them ever
20 counseled you and pointed out that you ought not to be
21 cursing at work?
22    A    No.
23    Q    Kathy, did she ever counsel you and tell you
24 you are cursing too much and tell you to knock it off?
25    A    No.
```

Falzarano Court Reporters

32

```
 1    Q    Captain Anderson, did he counsel and tell you
 2 to knock it off?
 3    A    No.
 4    Q    Sergeant Wells, did he ever counsel and tell
 5 you to knock it off?
 6    A    No.
 7    Q    Lieutenant Cothran, did he ever counsel you
 8 and tell you to knock it off?
 9    A    No.
10    Q    I know the sworn statement that you provided,
11 you acknowledged under oath that you, that you used the
12 word fuck or fucking when you speak.  I take it that
13 you stand by that today?
14    A    Occasionally.
15    Q    But as you sit here today, you can never
16 recall outside of the detective someone telling you
17 that they had a problem with you cursing at work?
18    A    Not to my recollection, no.
19    Q    The folks who have supervised you who I
20 named, Kathy, Captain Anderson, Sergeant Wells,
21 Lieutenant Cothran, are they all people whom you
22 respect and admire?
23    A    I respect them, yes.
24    Q    Do you believe you'd recall it if any of them
25 told you?
```

Falzarano Court Reporters

33

```
 1    A    They may have verbally in passing, I'm, I
 2 just can't recall.
 3    Q    Have you counseled anybody about cursing at
 4 work, asked anybody to stop, indicated that you were
 5 uncomfortable with their talking, cursing?
 6    A    I did confront Lieutenant Coleman once.
 7    Q    About cursing?
 8    A    About cursing.
 9    Q    When did that occur?
10    A    Late in 2000, early 2003 time frame.
11    Q    I am sorry, late --
12    A    2002, 2003 time frame.  Early 2003 time
13 frame.
14    Q    Under what circumstances did that occur?
15    A    It was at the smoke tree and she asked me
16 about my marriage and then she brought up the fact
17 that, quote, I have a fucking Master's degree, I should
18 be teaching, and it was the usual and asked me about my
19 wife and my marriage and if I had cheated on my wife,
20 and I told her that I took offense to it and I have no
21 idea why you keep asking me these questions and I would
22 like it to stop.
23    Q    Okay.  I understand that.  Were you
24 confronting her about talking to you about your wife
25 and marriage or were you talking, did you specifically
```

Falzarano Court Reporters

1  say anything, Hey, the cursing bothers me?
2          Was it the cursing that you were confronting
3  her on or was it the subject matter of your marriage
4  and your fidelity?
5      A    Let me clarify.  It wasn't the cursing in
6  general, it was the cursing at me that upset me.
7      Q    How was she cursing at you?
8      A    Calling me a fucking idiot.
9      Q    That was in the context of that conversation?
10     A    That was in that context on a regular basis.
11     Q    Now what effect did Lieutenant Coleman's
12  comments like that have on you?
13     A    I was afraid to come to work.
14     Q    How so?
15     A    I couldn't sleep at night.  I couldn't eat.
16  My marriage was suffering and I was just petrified to
17  come to work and have an altercation with her again.
18     Q    You considered these altercations?
19     A    They were attacks on my person.
20     Q    When did the first -- this goes all the way
21  back to when you arrived in January?
22     A    That is correct.
23     Q    Why did you wait until November of 2001 to
24  make initial contact with an EEO counselor?
25     A    I was using my chain of command.  I thought

---

1  they would take care of the problem.
2      Q    That began with Kathy?
3      A    Kathy.
4      Q    When would you say you first went to Kathy to
5  complain about Lieutenant Coleman?
6      A    Probably my third week working in the armory
7  after I graduated phase one.
8      Q    In February of 2000 how frequently would you
9  say that you had these altercations with Lieutenant
10  Coleman?
11     A    They were on a regular basis, sir, I couldn't
12  count.  They were continuous.
13     Q    What, to your knowledge, was being done?
14     A    I went, when I was in phase one and the first
15  attack occurred, I went to Captain Anderson.  When I
16  went to Kathy, Kathy went to Mr. Sheridan.
17  Mr. Sheridan assured us that he would handle it so I
18  assumed it was being handled.
19     Q    Did you talk to Mr. Sheridan about it?
20     A    No, I did not.
21     Q    You just told me that Mr. Sheridan told "us."
22          Did Mr. Sheridan tell you anything about
23  Lieutenant Coleman?
24     A    Mr. Sheridan told Kathy; Kathy told me.
25     Q    Were you ever present for any of

---

1  Mr. Sheridan's conversations with Kathy?
2      A    I was in Kathy's office.  Mr. Sheridan's
3  office was directly across the hall.  Kathy was very
4  upset about my last, because I was thinking about
5  quitting at one point and leaving.
6      Q    This situation occurred when?
7      A    Early 2001 time frame.
8      Q    Did you overhear Mr. Sheridan talking to
9  Kathy about Lieutenant Coleman?
10     A    Kathy went to Mr. Sheridan to ask that
11  something be done, that she leave me alone.  I had a
12  lot of work to do and she was making it difficult for
13  me to concentrate on my job.  Mr. Sheridan, I heard
14  Mr. Sheridan say he would take care of it.
15     Q    You personally heard Mr. Sheridan say he
16  would take care of it?
17     A    Yes, I did.
18     Q    Did you hear what Kathy said before
19  Mr. Sheridan said that?
20     A    Kathy went into Mr. Sheridan and said
21  Lieutenant Coleman's attacks on Phil have got to stop,
22  he's ready to quit.
23     Q    So the question that I asked you was whether
24  you heard Mr. Sheridan tell Kathy that he would take
25  care of Lieutenant Coleman and the answer to that is

---

1  yes?
2      A    Yes.
3      Q    Okay, that's early in 2001.  By that time
4  this had already been going on for a year.  During that
5  year, had you received assurances from Kathy that
6  things would change during that first year?
7      A    I asked Kathy if anything was being done
8  about my complaints and she told me that she went to
9  Mr. Sheridan and that Mr. Sheridan said he was handling
10  it.  I was not present for that conversation.
11     Q    Again, did you have assurances from Kathy
12  that things would change?
13     A    Kathy told me that Mr. Sheridan said he was
14  going to handle it so I felt assured that something
15  would be done.
16     Q    Did you know whether Kathy had spoken to
17  Lieutenant Coleman herself?
18     A    At that point, no.
19     Q    Had you spoken prior to early 2001 with
20  Captain Anderson --
21     A    Yes.
22     Q    -- about Lieutenant Coleman?
23     A    Yes.
24     Q    What, if anything, did he tell you was being
25  done?

CROSS-EXAMINATION

BY MR. DeNIGRIS:

Q     Phil, just one question here.  Do you have
any knowledge of who initiated this complaint about the
dispatch against you that you are involved in, do you
have any personal knowledge about that at all?

      In other words, before you answer the
question, in other words, has somebody come and told
you of authority in the police department who initiated
this complaint at all against you?

A     Second shift dispatcher Fletcher, he's a
union representative, union steward for our department.

Q     Who did he say initiated?

A     Lieutenant Coleman.

      MR. DeNIGRIS:  No further questions.

      MR. VERDUCCI:  Thank you.

      (Deposition adjourned:  3:45 p.m.)

Falzarano Court Reporters

56

---

STATE OF CONNECTICUT

      I, DEBORAH A. STEDMAN, a Notary Public, duly
commissioned and qualified in and for the State of
Connecticut, do hereby certify that pursuant to
Agreement there came before me on the 4th day of
May, 2004, the following named person, to wit:
Philip Kujawski, who was by me duly sworn to testify to
the truth and nothing but the truth; that he was
thereupon carefully examined upon his oath and his
examination reduced to writing under my supervision;
that this deposition is a true record of the testimony
given by the witness.

      I further certify that I am neither attorney nor
counsel for, nor related to, nor employed by any of the
parties to the action in which this deposition is
taken, and further, that I am not a relative or
employee of any attorney or counsel employed by the
parties hereto, or financially interested in this
action.

      IN WITNESS THEREOF, I have hereunto set my hand
this ___ day of _____ , 2004.

                    _____
                    Deborah A. Stedman
                    LSR #261
                    Notary Public

My Commission Expires:  September 30, 2007.

Falzarano Court Reporters

---

                I N D E X

WITNESS                          PAGE

Philip Kujawski

      Further Examination by Mr. Verducci       4
      Cross-Examination by Mr. DeNigris        54

Falzarano Court Reporters