UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ORIGINAL

- - - - - - - - - x
PETER ANDERSON, et al,
        Plaintiffs,   | Civil Action No.
                           3:03CV116(MRK)
    vs.                     |

GORDON R. ENGLAND, SECRETARY |
OF THE NAVY,                   November 5, 2003
        Defendant.     |
- - - - - - - - - x

DEPOSITION OF WILLIE COTHRAN

Taken before Deborah Stedman, LSR #261, a
Court Reporter and Notary Public, within
and for the State of Connecticut,
pursuant to Notice and the Federal Rules
of Civil Procedure, at the Naval Submarine
Base New London, Groton, Connecticut, on
November 5, 2003, commencing at 11:54 a.m.

FALZARANO COURT REPORTERS
117 N. Saddle Ridge
West Simsbury, CT  06092
860.651.0258

EXHIBIT E

### Page 12

1  A    The operations commander which was normally a
2  Navy chief.
3  Q    Who was above the Navy chief as the
4  operations commander?
5  A    The security officer.
6  Q    Okay.
7  A    The security officer, I think it was.
8  Q    Was there normally a Navy lieutenant above
9  the chief who was the operations officer and then
10 either a civilian or a Navy commander?
11 A    Well, let's see, when I came back in 1998,
12 there was a Navy chief, Chief Fogg was the operations
13 commander and the security officer was commander -- I
14 can't think of his name but. . .
15 Q    Let's look at the present configuration.
16 A    Okay, the present.
17 Q    Who is the operations chief?
18 A    The operations chief is master-at-arms Senior
19 Chief Diederichsen. Robert Diederichsen.
20 Q    Do you know how Senior Chief Diederichsen
21 spells his name?
22 A    D-i-e-d-e-r-e-n-s-e-n, I believe.
23 Q    Who is Senior Chief Diederichsen's first
24 level supervisor?
25 A    I believe that to be Lieutenant Donna

### Page 13

1  Baptiste.
2  Q    What is Lieutenant Baptiste's position?
3  A    She is the assistant to security officer, I
4  believe.
5  Q    Then who is her first level supervisor?
6  A    Mr. Jones.
7  Q    Now has that pretty much been the chain of
8  command where you've had an operations chief and then
9  either a police chief and then a security department
10 head above that person?
11 A    Yes, it has been that way.
12 Q    Under normal circumstances, is it the shift
13 commander's responsibility to initiate personnel
14 actions against persons in their shift?
15 A    Yes, under their -- yes.
16 Q    Now, if the chief, Senior Chief Diederichsen
17 or Lieutenant Baptiste or Mr. Jones saw something that
18 they believed was inappropriate or wrong, do they have
19 the ability to initiate personnel actions?
20 A    Well, the proper -- the proper policy and
21 procedure would be to notify the shift commander and
22 that would be handled, of course, on their authority to
23 take disciplinary action if that was needed.
24 Q    So the normal protocol would be that a senior
25 officer would notify a junior officer --

### Page 14

1  A    A shift commander.
2  Q    A shift commander?
3  A    Yes, the person in charge of the shift, the
4  entire shift.
5  Q    Is there anything that would prohibit the
6  chief or the lieutenant or Mr. Jones from initiating
7  personnel action on their own?
8  A    No, sir, I certainly wouldn't tell them not
9  to.
10 Q    So Mr. Anderson, when he was a captain on the
11 force, if he saw a breach of policy or regulation,
12 would the appropriate protocol have been for him to
13 notify the shift commander?
14 A    Well, I -- I am not sure that I can answer
15 that question. Captain Anderson would certainly, you
16 know, have the -- has the rank to do so; but as I said,
17 he was out of the command structure, so to speak, the
18 shift command structure and this is purely speculation
19 but I believe that he would bring this to the attention
20 of the proper shift supervisors.
21 Q    Sure, I understand that. And so it is
22 accurate then to say that he had the authority to take
23 action but would defer to protocol to bring it to a
24 shift commander?
25 A    Sir, I am not -- I personally do not know the

### Page 15

1  authority that Captain Anderson had working in the, in
2  the position that he was in. I don't know how much
3  authority he has because he was not involved in shift
4  -- I am sorry, shift activities; he was out doing his
5  training, going out to -- going off base, doing EVOC
6  and stuff and he wasn't involved at all in shift like
7  duties so I really don't know just what his authority
8  was.
9  Q    Was there any question as to whether he was
10 senior to you, him being a captain, you being a
11 lieutenant?
12 A    No, there was no question in my mind. I knew
13 that he was the captain, which I respected him for
14 being, being so, and I was a lieutenant. That issue
15 never came up.
16 Q    Again him being a captain, you being a
17 Lieutenant, did he have the authority to give you
18 orders to perform certain tasks or deeds?
19 A    I would think so. I believe so. That's
20 purely my belief.
21 Q    As a shift supervisor, your responsibility
22 included making daily assignments?
23 A    Yes.
24 Q    Now Lieutenant Coleman, as one of the other
25 two lieutenants, she had the responsibility for

1   overseeing her shift, correct?
2   A    Yes.
3   Q    What was her relationship to you in terms of
4   authority, was she simply a peer?
5   A    Yes.
6
7           (In the absence of Attorney Gale:)
8
9   Q    With the same types of responsibilities you
10  had?
11  A    Very same types, yes.
12  Q    So she did not have authority over you?
13  A    No.
14  Q    She was not your supervisor?
15  A    No.
16  Q    Did you have the authority to file formal
17  complaints against police officers for allegations of
18  work-related matters?
19  A    Yes.
20  Q    Did Lieutenant Coleman have that type of
21  authority as well?
22  A    Yes, I would think so.
23  Q    And would Captain Anderson have had the
24  authority to file formal complaints against police
25  officers for allegations of work-related matters?

1   A    Yes, I believe so.
2   Q    Now I want to focus in on the 2000, 2001,
3   2002 time period, so no need to go back earlier than,
4   for easy purposes, we will say 1998; that's when you
5   returned to the sub base police department, correct?
6   A    Yes, sir.
7   Q    And you've been in the sub base police
8   department continuously since 1999?
9   A    Yes, sir, continuously.
10  Q    So with that context in mind, since your
11  return in 1998, what shift or shifts have you
12  supervised? When you came back, what shift did you
13  have first?
14  A    When I came back I worked, I worked the day
15  shift, then I was put on the mid shift and then we all
16  decided what shift we wanted. I wanted swing shift, so
17  I was on swing shift. Lieutenant Coleman wanted days
18  because she was going to school and Lieutenant Stevens
19  wanted mids for whatever purpose.
20  Q    Let me go back then. So September of 1998
21  you started with the day shift?
22  A    When I came back from the commissary, yes,
23  sir, I believe so.
24  Q    When you say day shift, that's the shift that
25  begins at about what time?

1   A    At 0700 in the morning until 1530 or 3:30 in
2   the afternoon.
3   Q    How long did you have the day shift
4   initially?
5   A    I -- I don't recall. The mid watch, the mid
6   shift was having problems and I was asked to go to the
7   mid shift.
8   Q    The mid shift was the shift that began at
9   what time?
10  A    At 2300, eleven o'clock, until 0730 the
11  following morning.
12  Q    So do you recall approximately when you took
13  over the mid shift to correct these problems?
14  A    No, sir. I would have to refer to the notes
15  I have at home.
16  Q    When were you assigned to the swing shift?
17  A    I have no way of knowing that right now, sir.
18  Q    What shift are you working on now?
19  A    Mids.
20  Q    Do you have an idea whether you've been on
21  the mid shift for more than a year or two years?
22  A    Oh, no, I know exactly when I came on the mid
23  shift.
24  Q    Okay. When was that?
25  A    I was on the mid shift the 18th of May 2003.

1   Q    So you worked on the day shift from September
2   1998 for some period of --
3   A    No, sir. Okay, I was on the day shift; like
4   I said, at some point Stevens wanted the mid watch,
5   Coleman wanted the days because she was going to
6   school, I know that, and I was on swings. I, I am
7   sorry I don't have the --
8   Q    You are on swings now though, correct?
9   A    No, sir, I am on the mid watch now, working
10  nights. But, anyway, this was the way it was until the
11  year either 2000 or 2001, I am not sure which; but,
12  anyway, I was taken off the swing shift, Coleman was
13  put on the swing shift and I was put on days.
14  Q    Now just to be clear, the swing shift then is
15  the one that covers that period from about 1500 in the
16  afternoon until about 2300 at night?
17  A    2330, yes.
18  Q    2330?
19  A    Yes, right.
20  Q    Now what kind of contact do you have with the
21  shift supervisors who are -- well, let's start with
22  when you come on, what type of contact do you have with
23  the shift supervisor who you are relieving?
24  A    Well, when I first come on, I get the -- that
25  I am relieving or --

```
 1    Q    That you are relieving, so when you are
 2  coming onto work.
 3    A    Yes, I would get the shift pass down, you
 4  know, what activities are pending, what task has to be
 5  done by the oncoming shift, and just general
 6  information, who's the command duty officer, where
 7  maybe the operations officer is, he's at home or he
 8  called to say that he would be out for dinner or
 9  something, call him on the cell phone; just general
10  information like that.
11    Q    About how much of that information is passed
12  face-to-face with the person --
13    A    The biggest portion of it.
14    Q    About how long does that take typically?
15    A    A -- it's not really a formal setting, it's
16  like we are talking. Approximately five minutes or so,
17  I would estimate.
18    Q    Then after that five minutes, how much
19  contact would you have with the off going shift
20  commander on that day?
21    A    Well, I would sit at the computer and I'd go
22  in to check my mail and we would comment on, say like
23  various things that are coming up, we have training, we
24  have gun shoots or, or just casual conversation.  I
25  could not, you know, give you a set time; approximately
```

```
 1  -- I would say approximately 15 minutes and I could
 2  very possibly be in and out the office.  I would have
 3  to go get my weapon and I would possibly come back in
 4  and look at my "in" box and see if there was anything
 5  that I have to pass onto my shift for that evening,
 6  that night.
 7    Q    So is it fair to say then your contact with
 8  the off going shift commander would generally be less
 9  than a half an hour on a daily basis?
10    A    Yes, because the off going shift commander
11  should be leaving around 2330, unless there was some
12  project that, you know, they wanted to finish up or
13  something.
14    Q    Is it the general practice of your peers, the
15  other shift commanders that, you know, generally a
16  short while after a shift is over you leave the base?
17    A    Yes.
18    Q    Now in terms of -- tell me the conduct or the
19  contact, rather, that you have with the shift commander
20  who is relieving you.
21    A    It's approximately the same thing.  We talk,
22  like I said, we tell each other what's happening, you
23  know:  We had a drunk last night, you know; We had a
24  fight at barracks so-and-so; This guy jumped out the
25  window or something at BQ, whatever; just general,
```

```
 1  general information, helpful information that informs
 2  the oncoming shift of what has transpired.
 3    Q    So similarly then less than a half hour
 4  typically of daily contact with the oncoming shift
 5  commander?
 6    A    Approximately. Yes, approximately.
 7    Q    And so that half hour is about the same
 8  amount of contact that you'd have with Lieutenant
 9  Stevens or Lieutenant Coleman?
10    A    Yes.
11    Q    Now, you filed an EEO complaint back in the
12  spring of 2001, correct, on base?
13    A    If that says I did, yes.  I know I filed
14  several but, like I said, I don't know the dates. Yes,
15  I have filed several EEO complaints.
16    Q    Specifically I am referring to one that
17  alleged that Lieutenant Coleman was given preferential
18  treatment because of her sex; do you recall filing an
19  EEO complaint about that?
20    A    Okay, that was about the overtime, is that
21  correct, the 30 minutes overtime?
22    Q    I will tell you what, let me give you the
23  pages 2, 3 and 4 of the Record of Investigation from
24  your EEO complaint that was filed on April 16th, 2001.
25  Take a moment to read through that because I am going
```

```
 1  to ask you a few questions about that complaint.
 2    A    Uh-huh.  Okay.  Basically I understand it.
 3    Q    Okay.  Have you filed any EEO complaints
 4  after this one?
 5    A    Yes, I have.
 6    Q    And you filed EEO complaints prior to this
 7  one as well, correct?
 8    A    I believe there's one previous to that.
 9    Q    This, your statement on page 3 of the Record
10  of Investigation, indicates that, on November 10th,
11  2000, and I quote here, "I and three other shift
12  supervisors filed an EEO complaint based on sexual
13  preferential treatment and favoritism based on sexual
14  gender.  I spearheaded the complaint and was the
15  spokesperson for the group which management was not
16  pleased."
17    A    Yes, yes.
18    Q    And the basis of the complaint that you
19  filed in April 2001 alleged an allegation based on age
20  and reprisal, correct?
21    A    Yes, it sounds right.
22    Q    So you did not allege discrimination based on
23  gender, correct?
24    A    In 2001?
25    Q    Correct.  Would you like to take a look,
```

```
 1              FURTHER DIRECT EXAMINATION
 2
 3   BY MR. VERDUCCI:
 4       Q   Has she ever cursed you?
 5       A   Yes, when she told me I was lazy, fat, dumb
 6   or ignorant, whatever her terminology was, yes.
 7       Q   What was the curse that she used?
 8       A   That I was an f'ing dumb --
 9       Q   Okay.
10       A   -- ignorant.
11       Q   So the curse was used as an adjective, she
12   didn't call you a curse word?
13       A   She didn't call me but she said I was a --
14   yes.
15       Q   Was there any occasion other than that time
16   that she cursed at you?
17       A   We have had several arguments and curse words
18   has came up.
19       Q   Both ways, you to her and her to you?
20       A   Yes.
21           MR. VERDUCCI:  I have nothing
22   further.
23           MR. De NIGRIS:  Nothing further.
24           MR. VERDUCCI:  We are going to
25   reserve the right to continue at some future
```

Falzarano Court Reporters

```
 1   time.
 2
 3           (Deposition adjourned:  11:38 a.m.)
```

Falzarano Court Reporters

```
 1              STATE OF CONNECTICUT
 2       I, DEBORAH A. STEDMAN, a Notary Public, duly
 3   commissioned and qualified in and for the State of
 4   Connecticut, do hereby certify that pursuant to
 5   Agreement there came before me on the 5th day of
 6   November, 2003, the following named person, to wit:
 7   Willie Cothran, who was by me duly sworn to testify to
 8   the truth and nothing but the truth; that he was
 9   thereupon carefully examined upon his oath and his
10   examination reduced to writing under my supervision;
11   that this deposition is a true record of the testimony
12   given by the witness.
13       I further certify that I am neither attorney nor
14   counsel for, nor related to, nor employed by any of the
15   parties to the action in which this deposition is
16   taken, and further, that I am not a relative or
17   employee of any attorney or counsel employed by the
18   parties hereto, or financially interested in this
19   action.
20       IN WITNESS THEREOF, I have hereunto set my hand
21   this 20th day of November, 2003.
22
23           Deborah A. Stedman
24                  LSR #261
                 Notary Public
25
     My Commission Expires:  September 30, 2007.
```

Falzarano Court Reporters

### INDEX

| WITNESS | PAGE |
|---|---|
| Willie Cothran | |
| Direct Examination by Mr. Verducci | 4 |
| Cross-Examination by Mr. De Nigris | 40 |
| Redirect Examination by Mr. Verducci | 48 |
| Recross-Examination by Mr. De Nigris | 65 |
| Further Direct Examination by Mr. Verducci | 66 |

Falzarano Court Reporters

```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT


* * * * * * * * * * * * * * * * *
                                 *    CIVIL ACTION NO.
PETER ANDERSON, ET AL,           *    3:03CV116(MRK)
           PLAINTIFFS            *
                                 *
VS.                              *
                                 *
HANSFORD T. JOHNSON, ACTING      *
SECRETARY OF THE NAVY            *
           DEFENDANT             *
                                 *
* * * * * * * * * * * * * * * * *



              DEPOSITION OF: ROBERT DIEDERICHSEN
              DATE TAKEN: JUNE 17, 2004
              LOCATION: BRANDON REPORTING SERVICE
                        44 CAPITOL STREET
                        HARTFORD, CT 06106




   Reporter: KATHLEEN S. NORTON, RPR, LSR #105
        BRANDON SMITH REPORTING SERVICE, LLC
              44 Capitol Avenue
              Hartford, CT  06106
              Tel:  (860) 549-1850
              Fax:  (860) 549-1537
```

EXHIBIT F

Page 38

1    subordinates, she would use vulgarities in her
2    everyday speech.
3        Q    Are you familiar with an order that had been
4    issued in April of -- from April of 1998, I know you
5    weren't on board but when you came on board concerning
6    the standards of communication which was authored by
7    then Commander Stafford?
8        A    No, I'm not aware of it.
9        Q    What was your understanding about what the
10   standards of communication would be within the
11   Security Department as it applied to vulgar comments
12   or vulgar statements in the workplace?
13       A    That it's not tolerated.  It shouldn't be
14   used.
15       Q    When you have heard Lieutentant Coleman use
16   vulgarities, or for lack of a better term cuss words
17   in the workplace, have you taken any actions to
18   correct her about that?
19       A    Yes.
20       Q    Can you tell me how many times and what were
21   the circumstances -- how many times do you think you
22   have?
23       A    I probably conducted 10 to 15 on-the-spot
24   corrections as far as verbally telling her that that
25   language isn't acceptable.

Page 39

```
1     Q    And what was her response to you?
2     A    Kind of indifferent.
3     Q    Did she ever tell you -- did she use any of
4   the language that she used at the time that she was
5   issued a letter of reprimand by you to tell you about
6   what you're suggesting?
7     A    No.
8     Q    Not at all?
9     A    Not at all after she was issued her letter,
10  or in her suspension.
11    Q    How about before her letter of suspension,
12  did she ever say, "Fuck you" or anything like that?
13    A    No.  The only interaction I had with her like
14  that was the incident with the letter of reprimand and
15  that was the first incident and then I took a stand,
16  then and there, to let her know it wouldn't be
17  tolerated.  In other instances, the vulgarity wasn't
18  directed at me, but maybe, you know, in conversation a
19  word here, a word there, that it was just not
20  acceptable in the workplace.
21    Q    And your testimony is that that type of
22  language is unacceptable in the workplace?
23    A    Yes.
24    Q    Other than the outburst that she had there, I
25  need to go back into this a little bit more, had it
```

Page 40

1    come to your attention from any officer, anyplace in
2    the Security Department, the fact that she was
3    directing abusive or verbal comments directly toward
4    them?
5        A    To my knowledge, no one made any statements
6    that she was directing abusive comments toward them.
7        Q    When you say "any statement," let's explore
8    that. I mean not only written, but any verbal
9    communication to you, Chief, any E-mails that you got,
10   that whole list of communications. Is it your
11   testimony that you never received any communication
12   from any other male employee or any employee in the
13   Security Department that she was directing verbally
14   abusive comments toward them?
15       A    I seem to recall her receiving E-mail
16   complaints, like I spoke about Sergeant Wells and
17   Officer Kujawski. I don't recall the substance of the
18   E-mails, but from what I recall they were complaints
19   of workplace dispute.
20       Q    If you had seen -- and this is sort of an
21   opinion question, but if you had seen a male employee
22   engaging in the same type of -- under the same
23   circumstances that you corrected Lieutentant Coleman,
24   would you have taken any -- taken the same action to
25   that employee if they were talking like that in the

Page 41

1    workplace?

2        A    Yes, and I have.

3        Q    Who would that be to, do you remember?

4        A    Officer Kujawski.

5        Q    What were the circumstances about that?

6        A    He frequently uses vulgarities in the
7    workplace, in the hallways, and in the course of his
8    normal speech, and I have corrected him many times as
9    well.

10       Q    Have you ever heard complaints of him
11   directing vulgarities specifically at an individual as
12   it has been alleged for Lieutentant Coleman?  In other
13   words, I'll give you an example.  For example, there
14   are allegations in this case that Lieutentant Coleman
15   has said to male employees, "You are fucking idiots."
16   So I'm talking, have you ever heard of an officer
17   directing at a specific employee.  Have you ever heard
18   Officer Kujawski direct similar comments directed
19   toward a similar employee like that, that's been
20   alleged here that Lieutentant Coleman has said?

21       A    No.

22       Q    Now, you have some experience in law
23   enforcement now.  Would that be a fair statement?

24       A    Yes.

25       Q    Is it -- can you just give me an opinion as

Page 61

1            CERTIFICATE OF REPORTER

2

3    I, Kathleen S. Norton, a Registered Professional
     Reporter/Commissioner within and for the State of
4    Connecticut, do hereby certify that I took the
     deposition of ROBERT DIEDERICHSEN, on June 17, 2004,
5    who was by me duly sworn to testify to the truth and
     nothing but the truth; that he was thereupon carefully
6    examined upon his oath and his examination reduced to
     writing under my direction by means of Computer
7    Assisted Transcription, and that this deposition is a
     true record of the testimony given by the witness.
8

9    I further certify that I am neither attorney nor
     counsel for, nor related to, nor employed by any of the
10   parties to the action in which this deposition is taken
     and further that I am not a relative or employee of any
11   attorney or counsel employed by the parties hereto, nor
     financially interested in the outcome of the action.
12

13   IN WITNESS THEREOF, I have hereunto set my hand July 6,
     2004.
14

15

16   _____

17            Kathleen S. Norton

18

19   Notary Public   License No. 00105
     My commission expires:  7-31-07
20

21

22

23

24

25

```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
```

```
* * * * * * * * * * * * * * * * *
                                *    CIVIL ACTION NO.
PETER ANDERSON, ET AL,          *    3:03CV116(MRK)
         PLAINTIFFS,            *
                                *
VS.                             *
                                *
HANSFORD T. JOHNSON,            *
ACTING SECRETARY OF THE NAVY,   *
         DEFENDANTS.            *
                                *
* * * * * * * * * * * * * * * * *




              DEPOSITION OF: MICHAEL SHERIDAN
              DATE TAKEN: JUNE 17, 2004
              LOCATION: BRANDON SMITH
                        REPORTING SERVICE
                        44 CAPITOL AVENUE
                        HARTFORD, CT




  Reporter: KATHLEEN S. NORTON, RPR, LSR #105
       BRANDON SMITH REPORTING SERVICE, LLC
              44 Capitol Avenue
              Hartford, CT  06106
              Tel:  (860) 549-1850
              Fax:  (860) 549-1537




                       EXHIBIT G
```

Page 43

1    make me make that statement at that time, no.
2        Q    It appears to be an accurate reflection of
3    your signature?
4        A    Yes.  Certainly.
5        Q    And I may have asked this before, but did
6    Chief Haas -- has Chief Haas ever come to you and told
7    you that Coleman's conduct couldn't be tolerated and
8    that she had -- that she needed to be held accountable
9    for her conduct?
10       A    He may have said something like that, but I
11   can't recall specifically.
12       Q    Let me -- maybe I can help refresh your
13   recollection, and that would be -- it concerned the
14   fact of all the -- all the supposed or alleged
15   hostility that was in the workplace and the fact that
16   Chief Haas perceived Lieutentant Coleman as the person
17   most responsible for creating the hostility in the
18   workplace?
19       A    I don't understand what you mean by
20   hostility.
21       Q    Well, the alleged verbal harassment of males
22   by Lieutentant Coleman, the language that she
23   directed -- the vehemence of the language that she
24   directed toward lower employees?
25       A    As I have stated, Lieutentant Coleman, I have

Page 44

1  had other -- I have had both men and women discuss
2  issues regarding Lieutentant Coleman with me. And now
3  Chief Haas, I think, found it hard to work with any of
4  the civilians within the parameters of the bargaining
5  unit and that sort of thing. He being a military guy,
6  where military folks just say, "Do it," and you go do
7  it. It's not always the case with working with
8  civilians, it's a little bit different.
9      Q   But you had no reason -- you had no reason to
10 doubt Chief Haas -- let me rephrase it.
11         You didn't think that Chief Haas was simply
12 having a bad day or an inability to work with
13 Lieutentant Coleman when the incident blew up in his
14 office, did you?
15     A   No. And the reason is that I had two folks
16 come to me and provided a statement or statements,
17 each provided a statement.
18     Q   Okay. Did Chief Diederichsen ever come to
19 you and discuss with you at all his feelings that he
20 felt that Lieutentant Coleman was a cancer in the
21 workplace at all?
22     A   I don't recall that term, no.
23     Q   Do you recall any term that he might have
24 used to describe her performance?
25     A   No, because Lieutentant Coleman always got --

Brandon Smith Reporting

a1b513b3-2bb3-44ff-b40f-e83431093d8c

Page 50

1                     CERTIFICATE OF REPORTER

2

3    I, Kathleen S. Norton, a Registered Professional
     Reporter/Commissioner within and for the State of
4    Connecticut, do hereby certify that I took the
     deposition of MICHAEL SHERIDAN, on June 17, 2004, who
5    was by me duly sworn to testify to the truth and
     nothing but the truth; that he was thereupon carefully
6    examined upon his oath and his examination reduced to
     writing under my direction by means of Computer
7    Assisted Transcription, and that this deposition is a
     true record of the testimony given by the witness.

8

9    I further certify that I am neither attorney nor
     counsel for, nor related to, nor employed by any of the
10   parties to the action in which this deposition is taken
     and further that I am not a relative or employee of any
11   attorney or counsel employed by the parties hereto, nor
     financially interested in the outcome of the action.

12

13   IN WITNESS THEREOF, I have hereunto set my hand July 6,
     2004.

14

15

16              _Kathleen Sweeney Norton_

17                 Kathleen S. Norton

18

19   Notary Public   License No. 00105
     My commission expires:   7-31-07
20

21

22

23

24

25

Brandon Smith Reporting

a1b513b3-2bb3-44ff-b40f-e83431093d8c

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PETER ANDERSON, et. al., | : |
| Plaintiffs | : CIVIL NO. 3:03CV116(MRK) |
| v. | : |
| GORDON R. ENGLAND, Secretary of the Navy, | : |
| Defendant. | : November 17, 2003 |

FILED
Nov 19  2 16 PM '03

## STIPULATION OF PARTIAL DISMISSAL

Plaintiffs and Defendant, through their undersigned counsel, pursuant to Fed. R. Civ. P. 41, hereby stipulate to the partial dismissal of their claims as they apply to solely the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621. An Answer with Affirmative Defenses has been filed by the Defendant.

Respectfully submitted,

_____
Stephen G. DeNigris, Esq.[1]
2117 L Street NW Suite 283
Washington, D.C. 20037-1524
(800)791-9908
Federal Bar No. ct24396

By: _____
KEVIN J. O'CONNOR
United States Attorney

_____
Lisa E. Perkins, Esq.
Assistant United States Attorney
450 Main Street, Room 328
Hartford, CT 06103
Federal Bar No. ct23164

ORDERED ACCORDINGLY
KEVIN F. ROWE
Clerk, U.S. District Court
By _____
Deputy Clerk

[1] Attorney DeNigris reviewed the final version of this document and, in the interest of saving time, has authorized AUSA Perkins to sign on his behalf.

EXHIBIT H