UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PETER ANDERSON, et. al. | : | |
| Plaintiffs, | : | CIVIL NO. 3:03CV116(MRK) |
| v. | : | |
| GORDON R. ENGLAND<br>Secretary of the Navy, | : | |
| Defendant. | : | |

## PLAINTIFFS' LOCAL RULE 56(a)2 STATEMENT OF MATERIAL FACTS IN DISPUTE

1. Admitted.

2. Admitted.

3. Admitted.

4. *The shifts run from 7:00 a.m. to 3:30 p.m. (day shift); 3;00 p.m. to 11:30 p.m. (swing shift); and 11:00 p.m. to 7:30 a.m. (night).*

    **RESPONSE**: **Denied. The first shift came on at 6:30 a.m. and got off at 4:00 p.m. With regard to the second shift, that shift worked roughly from 3:00, 3:30 in the afternoon until 11:00, 11:30 at night. The third shift worked from 11:30 p.m. to 7:00 - 7:20 a.m.** (Exh. A - *Anderson Dep. Vol. I. 41- 44*)

5. *Shift Supervisors have less than one hour of interaction per day with personnel not assigned to their shifts.*

**RESPONSE**:  Denied.  Plaintiff Anderson had contact with the day shift supervisor approximately one hour per day.  He had regular contact with the other shifts about half that time.  However, his time with Lieutenant Coleman would vary especially when Lieutenant Coleman was assigned to CID (Criminal Investigations Division).  During that period he would have a lot of daily contact with her.  When Anderson left his office there was a good chance of seeing her somewhere.  (Exh. A- *Anderson Depo. Vol I, 43-45*; Exh. B - *Anderson Depo. Vol II, 22;* )

6.  *The use of profanity and vulgar language in this workplace by all employees is a common occurrence.*

**RESPONSE:**  Denied.  While some cursing was heard often in the workplace, it was not directed at employees as Lieutenant Coleman did.  Indeed, Lieutenant Coleman had been disciplined for her the use of profanities directed at employees.  She had been disciplined for cursing, and swearing stating "motherfucker I'm going to get you, you know this ain't over, spitting throwing papers."  Furthermore, Lieutenant Coleman was heard to ask subordinates questions such as "did you fuck last night?"  (Exh. A - *Anderson Depo. Vol. I, 47-48*; Exh. B - *Anderson Vol. II, 13, 18, 21-22*

7. Admitted.

8. Admitted.

9. Admitted.

10. Admitted.

11. *At all times relevant to this action, Plaintiff Captain Anderson was senior in position and rank to Lieutenant Pamela Coleman.*

**RESPONSE: Denied. While Captain Anderson held the rank of captain, it was a title without any supervisory authority. He was considered a token figurehead. In this regard, Captain Anderson had no authority to discipline or take any formal action against Lieutenant Coleman. He was considered a "token captain. He was required to go to his supervisors and make complaints. For each occasion he complained about Lieutenant Coleman, he had to go to his supervisor.** (Exh. A - *Anderson Depo. Vol. I, 9; 48; 52-53*)

12. *Lieutenant Pamela Coleman never exercised supervisory authority over Plaintiff Anderson.*

**RESPONSE: Denied. As testified by Captain Anderson, his position was not a position of authority greater than Lieutenant Coleman.** (Exh. A - *Anderson Depo. Vol. I; 39*)

13. *In 1998, Lieutenant Coleman filed an administrative complaint of discrimination against Plaintiff Anderson and another official regarding her (Coleman's) performance evaluation. In 2002, the EEOC found that Lieutenant Coleman had been discriminated against by Plaintiff Anderson and another official in reprisal for her prior EEO activity.*

**RESPONSE: Denied. Lieutenant Coleman apparently filed an EEO complaint concerning her non-selection and performance appraisal in 1994. Plaintiff Anderson believed that the complaint was against Commander Wroolie. He had no knowledge as to whether she prevailed in the EEO complaint. He was never ordered to undergo any type of training and never received any type of discipline.** (Exh B - *Anderson Depo. Vol. II, 5-6*).

3

14.     *Prior to the filing of the instant action, Plaintiff Anderson was made aware of the administrative complaint filed against him by Lieutenant Coleman.*

**RESPONSE: Denied. Lieutenant Coleman apparently filed an EEO complaint concerning her non-selection and performance appraisal in 1994. That preceded this complaint by approximately 9 years. As noted herein, Plaintiff Anderson believed that the complaint was against Commander Wroolie. He had no knowledge as to whether she prevailed in the EEO complaint. He was never ordered to undergo any type of training and never received any type of discipline. Indeed, the complaints were apparently groundless as Lieutenant Coleman was disciplined for her actions and Plaintiff Anderson never had any action taken against him.** (Exh. A - *Anderson Depo. Vol. I, 48-49;* Exh. B - *Vol. II, 5-6*).

15.     *Plaintiff Anderson had very little contact with Lieutenant Coleman on a day-to-day basis.*

**RESPONSE: Denied. Plaintiff Anderson had contact with the day shift supervisor approximately one hour per day. He had regular contact with the other shifts about half that time. However, his time with Lieutenant Coleman would vary especially when Lieutenant Coleman was assigned to CID (Criminal Investigations Division). During that period he would have a lot of daily contact with her. When Anderson left his office there was a good chance of seeing her somewhere. She was running around yelling at somebody or in the hallways and Anderson would see her when he traveled between offices.** (Exh. A - *Anderson Depo. Vol I, 43-45;* Exh. B - *Anderson Depo. Vol II, 22;* )

16. *In the Summer of 2001, Plaintiff Anderson and Lieutenant Coleman attended a mediation session to resolve issues that each had interacting with each other. Each agreed to avoid the other.*

**RESPONSE: Denied. Plaintiff Anderson clearly opined that there was no agreement. It was "presumed" that the parties wouldn't talk to each other. It was neither an "agreement" or a "practice." Plaintiff Anderson characterized it as "if I'm not there and I'm not anywhere near her, there's nothing coming at me, so it was like an avoidance thing more or less."** (Exh. B - *Anderson Depo. Vol. II, 7-8*).

17. *Plaintiff Anderson went out of his way to avoid interacting with Coleman between the summer of 2001 and his retirement in September 2002.*

**RESPONSE: Denied. It was presumed that the parties would avoid each other and Plaintiff Anderson attempted to avoid her. However, Plaintiff Anderson was "not very good" at avoiding Lieutenant Coleman. When Anderson left his office, there was a good chance of seeing Coleman somewhere. It was probable that she came into his office.** (Exh. B - *Anderson Depo. Vol. II, 8; 22)*.

18. Admitted.

19. *Although Plaintiff Anderson was senior to Lieutenant Coleman, Plaintiff Anderson never took disciplinary action against Coleman.*

**RESPONSE: Denied. While Captain Anderson held the rank of captain, it was a title without any supervisory authority. He was considered a token figurehead. In this regard, Captain Anderson had no authority to discipline or take any formal action against Lieutenant Coleman. He was considered a "token captain. He was required to go to his**

supervisors and make complaints.  For each occasion he complained about Lieutenant Coleman, he had to go to his supervisor.   (Exh. A - *Anderson Depo. Vol. I, 9;  48; 52-53*)

As testified by Captain Anderson, his position was not a position of authority greater than Lieutenant Coleman.  (Exh. A - *Anderson Depo. Vol. I; 39*)  The difference between the ranks was that Captain Anderson received more money.  (Exh. A - *Anderson Depo. Vol. I, 8*)  In 1994, Captain Anderson disciplined Lieutenant Coleman.  He was the only person who had ever disciplined her up till that time.  (Exh. A - *Anderson Depo. Vol. I, 33*).

20. *At all times relevant to this action, Plaintiff Anderson was not subjected to any uninvited or offensive physical contact by Lieutenant Coleman.*

RESPONSE.  Denied.  In January 2000, Lieutenant Coleman slapped Plaintiff Anderson.  She did not touch him in a sexually suggestive or lewd manner. (Exh. B - *Anderson Depo. Vol. II, 9)*.

21. Admitted.

22. Admitted.

23. *At times relevant to this action, Plaintiff Cothran frequently used profanity and vulgarities in the workplace and would tell stories of sexual encounters to Plaintiff Anderson.*

RESPONSE:  Denied.  The testimony involved whether Lieutenant Cothran ever "cursed" at work.  The frequency and nature of the language was never discussed.  Moreover,  the curse occurred behind closed doors and never directed any language toward and employee as did Lieutenant Coleman.  At best it was "a couple of times" and considered venting behind closed doors.  Moreover, every "once in a blue moon, within the

**confines of a private office in a one-on-one conversation Lieutenant Cothran talked about a sexual matter.** (Exh. B - *Anderson Depo. Vol. II, 18-19; 25*)

    24.    Admitted.

    25.    *Plaintiff Wells worked on Lieutenant Coleman's shift for less than three months between January 2000 and the present.*

**RESPONSE: Denied. The evidence reveals that Plaintiff Wells estimates his work on the same shift with Lieutenant Coleman as being between three to six months.** (Exh. C - *Wells Depo. Vol. I, 23, 26*).

    26.    Admitted.

    27.    Admitted.

    28.    Admitted.

    29.    *In his administrative claim, Wells did not claim that Lieutenant Coleman sexually harassed him.*

**RESPONSE: Denied. Plaintiff Wells testified that his complaint listed reprisal for a previous complaint and harassment. With regard to harassment the form read non-sexual harassment. But as Wells testified that "I don't necessarily agree that that's what he actually meant to check but it does say that."** (Exh. C - *Wells Depo. Vol. I, 12-13*).

    30.    Admitted.

    31.    Admitted.

    32.    Admitted.

33.     *Plaintiff Kujawski had only limited daily contact with Lieutenant Coleman.*

**RESPONSE. Denied. When Plaintiff Kujawski was working the armory he would see her four to five times a day. She was on day shift. He worked on day shift in the armory and training division for one year. During which she would direct hostile comments towards him concerning his marriage and stating that he was a "fucking loser."** (Exh. D - *Kujawski Depo. Vol. I, 17-19*) **In addition, when Lieutenant Coleman went to the second shift 3:30 p.m. to 11:30 p.m., Kujawski would still see her daily.** (Exh E. - *Kujawski Depo. Vol. II, 19*)

34.     *The majority of plaintiff Kujawski's contacts were at a designated smoking area.*

**RESPONSE: Denied. Many of the contacts were at the smoking tree. However, plaintiff Kujawski would see Lieutenant Coleman when he was in the armory and training approximately four to five times a day.** (Exh D - *Kujawski Depo. Vol. I, 17-19*) **In addition, when Lieutenant Coleman went to the second shift 3:30 p.m. to 11:30 p.m., Kujawski would still see her daily.** (Exh. E - *Kujawski Depo. Vol. II, 19*)

35.     *Plaintiff Kujawski's practice was to ignore Lieutenant Coleman and leave the area whenever he could.*

**RESPONSE: Denied. Kujawski could not ignore these comments because they were so frequent he got to a point he started getting used to them and tried to avoid Lieutenant Coleman at all costs. He was scared. Her verbal were so severe and continuous that when she wasn't calling Kujawski a "fucking loser" or questioning him as to whether he was cheating on his wife, she was belittling him in front of other police officers. Plaintiff Kujawski lost 45-50 pounds, developed migraine headaches and was required to see a**

**psychiatric counselor.** (Exh. D - *Kujawski Depo., Vol I., 16;  Exh. E - Vol. II, 22-24; 42*).

 36. *Plaintiff Kujawski complains of a few isolated incidents over a three year period.*

 **RESPONSE: Denied.  Plaintiff Kujawski initiated his complaints about Lieutenant Coleman's conduct with Kathy Wociechowski.  Ms. Wociechowski went to complain to Mr. Sheridan.  Plaintiff Kujawski followed up on his complaint.  He also complained to Captain Anderson.  Kujawski also sat down with an EEO counselor on three or four different occasions since he started work at the naval base.  He went to the union at the base.  He filed several EEO complaints over Lieutenant Coleman's conduct.  He discussed his complaints with EEO investigations.** (Exh. D - *Kujawski depo. Vol. I, 6; Exh. E - Vol. II, 22, 24, 25*)

 37. Admitted.

 38. *At all times relevant to this case, Plaintiff Kujawski has been the subject of complaints about his frequent use of profanity and vulgarities in the workplace.*

 **RESPONSE.  Denied.  Plaintiff Kujawski has never been formally or informally admonished for cursing at work.  He has no knowledge of any complaints.  His supervisors have never counseled him or pointed out to him that he ought not to be cursing at work.** (Exh. E - *Kujawski Depo. Vol. II, 31*)

 39. Admitted.

 40. Admitted.

       Respectfully submitted,

       _____
       Stephen G. DeNigris, Esq.
       Federal Bar No. ct24396
       Attorney for the Plaintiffs
       Law Offices of Stephen G. De Nigris, P.C.
       2100 M Street, N.W. Suite 170-283
       Washington, DC 20037-1233

       Virginia Office:
       (703)416-1036
       (703)416-1037 (fax)

Dated: September 20, 2004.

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing Plaintiffs' Local Rule 56(a)(2) statement was sent by U.S. Mail, first class postage prepaid, to Lisa E. Perkins, Esq., Assistant United States Attorney, 450 Main Street, Room 328 Hartford, CT 06103 on the 20th day of September, 2004.

                                                  _____
                                                  Stephen G. DeNigris, Esq.